IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **PIUS AWUAH, NILTON DOS SANTOS, GERALDO CORREIA, DENISSE PINEDA, JAI PREM, ALDIVAR BRANDAO,** and all others similarly situated,<br><br>   Plaintiffs,<br><br>   v.<br><br>**COVERALL NORTH AMERICA, INC.,**<br><br>   Defendant. | Case No. 07-10287 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
COVERALL NORTH AMERICA, INC.'S MOTION TO STAY
PROCEEDINGS AS TO PLAINTIFF PIUS AWUAH PENDING ARBITRATION
AND TO EXTEND TIME TO RESPOND TO THE COMPLAINT**

Defendant, Coverall North America, Inc. ("Coverall"), by its attorneys, respectfully submits this Memorandum of Law in Support of its Motion: (i) pursuant to Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §3, to Stay Proceedings as to plaintiff Pius Awuah Pending Arbitration; and (ii) to extend Coverall's time to answer, move or otherwise plead in response to the claims of plaintiff Pius Awuah until the Court resolves this Motion to Stay Proceedings.

**PRELIMINARY STATEMENT**

This action arises out of a written Franchise Agreement entered into by and between Coverall, a franchisor of commercial janitorial cleaning businesses, and plaintiff Pius Awuah ("Awuah"). Pursuant to the Franchise Agreement, Coverall offered, and Awuah accepted, a limited license to operate a Coverall franchise in Massachusetts. Awuah (who abandoned his franchise over twenty-one (21) months ago) now claims that Coverall breached its obligations

under and made certain misrepresentations in connection with his execution of the Franchise Agreement.

The merits (or lack thereof) of his claims aside, Awuah and Coverall agreed, in entering into the Franchise Agreement, that they would submit all disputes arising out of or relating to the Franchise Agreement or the parties' relationship to arbitration in Massachusetts before the American Arbitration Association. Because, as shown below, Awuah's claims fall well within the ambit of the parties' arbitration agreement, §3 of the FAA requires that this action be stayed pending arbitration.

## RELEVANT BACKGROUND FACTS

**A.     The Parties and Their Written Franchise Agreement**

Coverall is a Delaware corporation with its principal place of business in Boca Raton, Florida. Coverall is engaged in the business of granting franchises to qualified persons to operate commercial janitorial cleaning businesses, and to use Coverall's trade names and marks, as well as Coverall's operating system (the "Coverall® System"), in connection therewith. (*See* the June 29, 2007 Declaration of Shirley Klein ["Klein Decl."] at ¶ 3; a true and correct copy of the Klein Decl. is annexed hereto as Exhibit A.) Coverall franchisees are provided with, among other things, training, equipment, billing and collection services, and a quality control program. (Klein Decl., ¶ 4.) Coverall also offers its franchisees customer accounts to clean. (Klein Decl., ¶ 5.) Under the Coverall System, Coverall enters into contracts with customers for cleaning services, and delegates the performance of the services under those contracts to its franchisees. (Klein Decl., ¶ 5.)

The amount of initial business which Coverall offers its franchisees depends on the type of franchise that a franchisee purchases. (Klein Decl., ¶ 6.) In that regard, Coverall offers

several different franchises to prospective franchisees. (Klein Decl., ¶ 6.) A franchisee may purchase, for example, a franchise package known as a "P-1500." If a franchisee purchases a P-1500 franchisee, Coverall is obligated to offer that franchisee one or more accounts (located in the area in which the local Coverall office does business) which total $1500 in gross dollar volume per month. (*See* Awuah's Franchise Agreement, a true and correct copy of which is annexed as Exhibit 1 to the June 28, 2007 Declaration of Joseph Falbo ["Falbo Decl."]; a true and correct copy of the Falbo Decl. is annexed hereto as Exhibit B.) A P-3000 package, in contrast, would obligate Coverall to offer a franchisee accounts totaling $3,000 in gross monthly dollar volume. The Franchise Agreement explains the nature of this obligation in detail, as well as the time by which Coverall must offer this business. For example, Paragraph 4(A) of the Franchise Agreement makes clear that Coverall has 120 days from the day on which a franchisee completes training to offer the required amount of business (longer for larger packages). The Franchise Agreement also makes clear that a franchisee cannot prevent Coverall from satisfying this contractual obligation by unreasonably rejecting accounts which Coverall offers. Specifically, Paragraph 4 of the Franchise Agreement provides that if a franchisee "refuses to accept any customer account(s) timely offered to fulfill" his or her franchise package, "Coverall shall be deemed to have fulfilled its obligations to offer customer accounts . . . ."[1]

Awuah is a former franchisee of Coverall. On February 21, 2005, Awuah entered into a written Janitorial Franchise Agreement ("Franchise Agreement") with Coverall d/b/a Coverall of Boston. (Falbo Decl., ¶ 3.) Awuah purchased a P-3000 franchise from Coverall. (Falbo Decl., ¶

---

[1] As long as the franchisee's refusal of an account is not unreasonable, Coverall remains obligated to offer the full amount of business required under the package. (Franchise Agreement ¶4(A)(ii).)

5.)  His decision to do so was not made in haste.  Awuah first met with Coverall in September of 2004.  (Falbo Decl., ¶ 5.)  At this meeting, Awuah received both a completed copy of Coverall's Franchise Agreement and a copy of Coverall's franchise offering circular as required by the Federal Trade Commission's Franchise Rule, 16 C.F.R. § 436.  (Falbo Decl., ¶ 5.)  The offering circular – a disclosure document which the Federal Trade Commission requires Coverall supply to prospective franchisees before they execute their franchise agreements – contains detailed disclosures regarding all aspects of the Coverall system.  Awuah apparently considered these materials carefully before he made the decision to acquire his franchise, because Awuah waited until February 9, 2005 – nearly six (6) months after he received copies of his Franchise Agreement and Coverall's offering circular – to sign his Franchise Agreement.[2]

In September 2005, Awuah advised Coverall that he wanted to end his relationship with Coverall and would no longer be servicing his accounts.  (Falbo Decl., ¶ 9.)  Soon after this, on September 26, 2005, Coverall sent Awuah a letter advising him that his Franchise Agreement was terminated as a result of his voluntary abandonment of his franchise business.  (Falbo Decl., ¶ 9.)

---

[2]   That Awuah was so diligent and painstaking in his consideration of Coverall's franchise opportunity is not surprising.  Awuah began selling real estate in 2004, and obtained his broker's license in 2005. (Falbo Decl., ¶ 11.)  Given this training, it seems that Awuah did exactly what he was supposed to do during the nearly six (6) month period between his receipt of Coverall's offering circular and his execution of his Franchise Agreement – namely, carefully consider Coverall's franchise program and determine whether that program was right for him.  Indeed, the express purpose of giving a franchisee like Awuah a copy of a franchisor's offering circular before he signs his franchise agreement is to "provide the prospective franchisee with sufficient time to thoroughly examine the disclosure statements and contract, to consult with attorneys, accountants, and other experienced business persons, to compare competing franchise offerings, and as a result to make an informed judgment as to the desirability of entering into a business relationship with the franchisor in question."  *See* Statement of Basis and Purpose Relating to Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, at ¶G, reprinted at 2 Bus. Franchise Guide (CCH) ¶6300 *et seq.*, at p. 9362.

**B.     Awuah's Complaint**

Approximately 1½ years later (on February 15, 2007), Awuah filed this lawsuit. An Amended Complaint was filed on February 21, 2007, and a Second Amended Complaint (which named certain additional representatives of this putative class of plaintiffs) was filed on or about June 5, 2007.

While it sets forth a litany of claims, the Second Amended Complaint ("Complaint") is premised primarily on the following allegations: (i) that Coverall breached its Franchise Agreements with Awuah and the other plaintiffs by supposedly failing to provide plaintiffs with the business it was required to offer under the plaintiffs' respective Franchise Agreements and by taking accounts away from plaintiffs "for no reason" (Complaint ¶¶24-25, 34); (ii) that Coverall somehow defrauded plaintiffs in connection with the execution of their Franchise Agreements by representing that Coverall had sufficient business to satisfy its obligations when, according to the Complaint, it did not,[3] and by promising that cleaning accounts would be "geographically convenient to one another" and to the franchisees' homes (Complaint ¶¶13-14, 32); and (iii) that Coverall "misclassified" the plaintiffs as independent contractors. (Complaint ¶41.) Plaintiffs attempt to color their scant allegations of misconduct – which they contend support the certification of a nationwide class – by further claiming that Coverall required Awuah (who

---

[3]     The Franchise Agreement specifically advised Awuah that "Coverall may or may not have an inventory of customer accounts available to offer [his] dollar amount of Initial Business on the date [he] sign[ed] [his] Franchise Agreement. (Franchise Agreement ¶4(A)(iii).)

supposedly has "little to no fluency in English") to sign a contract that was only available in English. (*Id*. at ¶¶18-19.)[4]

The documentary evidence not only undercuts these claims, but makes clear that Awuah was offered everything he was entitled to under his Franchise Agreement and more. As noted above, the crux of the Complaint is Awuah's claim that Coverall was unable to offer him the amount of initial business he was entitled to receive under his Franchise Agreement. This is simply untrue. Awuah purchased a P-3000 franchise package from Coverall.[5] Therefore, under Paragraph 4 of the Franchise Agreement, Coverall was required to offer Awuah customer accounts which equaled $3,000 in gross dollar volume per month. Paragraph 4 of the Franchise Agreement also makes clear that Coverall had 120 days from the date on which Awuah completed his training to satisfy this obligation.

Awuah completed his Coverall training on March 17, 2005. (Falbo Decl., ¶ 6.) As a result, Coverall had until July 15, 2005 (120 days thereafter) to offer Awuah accounts totaling $3,000 in gross dollar volume per month. Coverall not only satisfied this obligation, but it did so long before July 15, 2005. By the end of April 2005, Awuah had accepted accounts totaling

---

[4] While legally irrelevant, this allegation is particularly unfounded in Awuah's case. Awuah appears fluent in English. (*See* Falbo Decl., ¶ 10.) That is clear not only from the documents Awuah filled out, but by his background. Awuah is a licensed real estate broker who passed the examination needed to obtain that license. That examination is given in English. Furthermore, Awuah was apparently born in Ghana, which is where he resided before he emigrated to the United States. The official language of Ghana is English.

[5] The Complaint alleges that Awuah "paid Coverall an initial fee of approximately $14,000" for his franchise package. (Complaint ¶25.) That too is simply untrue. While Awuah was required to pay $14,000 for the franchise he purchased from Coverall, the amount he actually paid is far less. Awuah made an $8,500 down payment towards the purchase of his franchise and financed the remaining $5,500 under a promissory note Awuah executed in favor of Coverall. (Falbo Decl., ¶ 4.) A balance of $4,459.95 remains due and owing under this note. (Falbo Decl., ¶ 4.)

$2,746 in gross dollar volume per month (only $264 less than Coverall was required to offer Awuah). (Falbo Decl., ¶ 6.) Between April and June of 2005, Coverall repeatedly attempted to give Awuah additional accounts that would have more than filled the small amount of his package that remained to be filled, but Awuah consistently rejected these offers (often for no reason at all). (Falbo Decl., ¶¶ 6-7.) On April 7, 2005, for example, Awuah rejected an account that would have earned him an additional $730.00 in gross dollar volume per month – more than enough to satisfy Coverall's obligations. (Falbo Decl., ¶ 6.) While he claimed that this account (which was only 13 miles from his house) was too far away, he later accepted another account – Office Environments of New England – that is located the very same 13 miles from his house. (Falbo Decl., ¶ 6.) Less than two weeks later (on April 19, 2005), Awuah rejected another account (located about 18 miles from his house) that would have earned him an additional $1,975 in gross dollar volume per month. (Falbo Decl., ¶ 6.)

The rejections continued. In the middle of May, Awuah rejected yet another account. (Falbo Decl., ¶ 7.) He gave no reason whatsoever for rejecting this account – which would have earned him another $210 in gross dollar volume per month – unless "no" is considered a reason. (Falbo Decl., ¶ 7.) Finally, in early June of 2005, Awuah rejected an account that would have generated an additional $220.00 in gross dollar volume per month. (Falbo Decl., ¶ 7.) This account (Empire Recycling) is less than 6½ miles from Awuah's house and, more importantly, is located **right next door** to an account that Awuah had previously accepted and was then cleaning. (Falbo Decl., ¶ 7.)

In sum, Coverall offered Awuah **$5,861** in customer accounts – nearly **double** the amount it was required to offer – by June 7, 2006, less than 90 days after he completed training.

Under Paragraph 4 of the Franchise Agreement, that more than satisfied Coverall's obligations to Awuah.

Awuah's claims that the accounts which he was offered were "spread very far apart" (Complaint ¶32), and that accounts were taken away from Awuah without affording him an "opportunity to correct or challenge alleged deficiencies in [his] performance" (Complaint ¶34), are similarly unfounded. As to the former claim, the documents make clear that Awuah rejected one account that was the same distance from his house as one he accepted, and later rejected another account that was located next door to one of the accounts he was cleaning. Such accounts can scarcely be considered "very far apart." In terms of the latter allegation, it appears that the only account that Awuah lost because of his poor performance was New Penn Terminal. However, this account was not "taken away" for "no justifiable reason," as the Complaint suggests. To the contrary, Coverall received three separate complaints from New Penn Terminal about the service that Awuah was providing. (Falbo Decl., ¶ 8.) On each occasion, Awuah was given an opportunity to remedy his poor service. (Falbo Decl., ¶ 8.) On each occasion, he failed to do so. (Falbo Decl., ¶ 8.) After the third such failure, Coverall scheduled a meeting with Awuah at the customer's facility to see if the problem could be rectified. (Falbo Decl., ¶ 8.) Awuah, however, never bothered to show up for this meeting. (Falbo Decl., ¶ 8.) Not surprisingly, the customer then requested a change. (Falbo Decl., ¶ 8.)

**C.     The Parties' Arbitration Agreement**

While factually unfounded, Awuah's claims should not have been filed in this Court. In entering into the Franchise Agreement, Coverall and Awuah explicitly agreed that they would submit all disputes arising out of or relating to the relationship of the parties, the Franchise Agreement, or any related agreement between the parties to arbitration before the American

Arbitration Association in Boston, Massachusetts. Paragraph 21 of the Franchise Agreement thus provides, in pertinent part, that:

> all controversies, disputes, or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual . . . shall be submitted promptly for arbitration.
>
> Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.
>
> The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.

(*See* Franchise Agreement, ¶21.) The Franchise Agreement is to be "interpreted and governed by the laws of the state in which the Franchise" at issue is located (which, in this case, is Massachusetts.) (Franchise Agreement ¶23.)

## **ARGUMENT**

### **I.     This Action Should Be Stayed Pending Arbitration**

#### **A.     The FAA Mandates That All Arbitrable Claims Be Submitted To Arbitration**

The principles underlying the policies favoring arbitration agreements are well-established in this Circuit. Where, as here, "there is an agreement to arbitrate, the FAA reflects a strong, well-established, and widely recognized federal policy in favor of arbitration." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 29 F.3d 727, 730 (1st Cir.), *cert. granted*, 513 U.S. 1013 (1994), *aff'd*, 515 U.S. 528 (1995); *accord KKW Enters., Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 49 (1st Cir. 1999); *Painewebber Inc. v. Elahi*, 87 F.3d 589, 593 (1st Cir. 1996) ("[T]he FAA "'is a congressional declaration of a liberal federal

policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.'") (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983)). Indeed, "[t]he 'primary purpose' of the FAA is to ensure 'that private agreements to arbitrate are enforced according to their terms.'" *Painewebber*, 87 F.3d at 593 (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 479 (1989)); *accord Moses H. Cone Memorial Hosp.*, 460 U.S. at 24 (the FAA expresses Congress' intent "to mandate enforcement of all covered arbitration agreements").[6]

One of the primary vehicles for the enforcement of arbitration agreements is Section 3 of the FAA. That section provides as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one of the parties, stay the trial of the action

---

[6] The arbitration agreement at issue in this case clearly falls within the scope of the FAA. The FAA applies whenever there is an agreement to arbitrate contained in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2; *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74, 115 S. Ct. 834, 841 (1995). The term "commerce" is to be broadly construed. *Prima Paint Corp. v. Flood & Conklin Mfg. Corp.*, 388 U.S. 395, 401-02, 87 S. Ct. 1801 (1967). In fact, the Supreme Court has held that the FAA extends to the full reach of the Commerce Clause. *See Allied-Bruce Terminix Cos.*, 513 U.S. at 273-74. The Franchise Agreement was entered into between Awuah, a resident of Massachusetts, and Coverall, a Delaware corporation with its principal place of business in Florida. Because the Franchise Agreement calls for a continuous stream of products and funds to be exchanged between these diverse parties, the agreement plainly evidences "commerce" among the several states for purposes of the FAA. *See KKW Enterprises,* 184 F.3d at 49 (franchise agreements between Massachusetts franchisee and Illinois franchisor "implicate interstate commerce, thus subjecting them to the reach of the FAA"); *Ommani v. Doctors Assoc., Inc.*, 789 F.2d 298, 299 (5th Cir. 1986) (fraud claims between Connecticut franchisor and Texas franchisee evidence commerce within the meaning of the FAA); *Creson v. Quickprint of Am., Inc.*, 558 F. Supp. 984, 986 (D. Mo. 1983). Furthermore, Coverall and Awuah agreed, in Section 21 of the Franchise Agreement, that "[a]rbitration shall be subject to the Federal Arbitration Act."

until such arbitration has been had in accordance with the terms of the Agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. §3.  In other words, absent proof that the party seeking to invoke arbitration is "in default in proceeding with . . . arbitration" – which is not at issue here – a party is entitled to a stay under Section 3 if the court is satisfied that the issue in the pending action "is referable to arbitration under [the parties' agreement]."  *See also KKW Enters.,* 184 F.3d at 50 (Under Section 3 of the FAA, if a suit is brought "on an issue referable to arbitration under a written arbitration agreement, the court shall stay a matter until the arbitration "has been had in accordance with the Agreement.").

**B.     The Arbitration Clause Encompasses Each Of Awuah's Claims**

Here, the issues raised in Awuah's Complaint are clearly referable to arbitration under the parties' written agreement.  "[W]hether an issue is to be decided by [an] arbitrator is a matter of the parties' contractual intent."  *Painewebber*, 87 F.3d at 593.  However, "[t]he court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'"  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353 (1985) (quoting *Moses H. Cohn Memorial Hosp.*, 460 U.S. at 24); *see also Lee v. Chica*, 983 F.2d 883, 886 (8th Cir.) ("[a]rbitrability of contracts evidencing interstate commerce is governed by federal substantive law rather than state law"), *cert. denied*, 510 U.S. 906 (1993).  That body of law "'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 n.8, 115 S. Ct. 1212, 1218 n.8

(1995) (quoting *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25).  In fact, as the United States Supreme Court has repeatedly made clear, doubts regarding arbitrability should be resolved in favor of arbitration "unless it can be said with **positive assurance** that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute."  *AT&T Technologies v. Communication Workers*, 475 U.S. 643, 650 (1986) (emphasis added); *accord Mitsubishi Motors Corp.*, 473 U.S. at 626 ("as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability"); *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24 ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration").

   This mandate applies with even greater force where, as in this case, the arbitration clause is broad.  *See Cleveland Wrecking Co. v. Iron Workers Local Union 40*, 947 F. Supp. 745, 748 (S.D.N.Y. 1996) (characterizing a clause which dictated submission to arbitration of "[a]ny claim or controversy arising out of or relating to th[e] agreement" as the "paradigm of a broad clause"), *aff'd*, 136 F.3d 884 (2nd Cir. 1997); *AT&T Technologies*, 475 U.S. at 650.  "If the arbitration clause is broad, the Court 'must find that the parties bargained to have any dispute that arguably falls within the scope of that clause settled through arbitration absent compelling proof to the contrary.'"  *Cleveland Wrecking Co.*, 947 F. Supp. at 748 (quoting *Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 886 (2nd Cir. 1982)); *accord United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585 (1960) (only the "most forceful evidence" is sufficient to prevent a dispute from being submitted to arbitration).

   Applying these standards, there can be no doubt that Awuah's claims fall within the scope of the broad arbitration clause in the Franchise Agreement and, accordingly, that Coverall is entitled to a stay of Awuah's claims pending arbitration.  The Franchise Agreement contains

the mostly broadly worded arbitration clause, requiring the submission to arbitration of "all controversies, disputes or claims between Coverall . . . and Franchisee [Awuah] . . . arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall . . . ." Each of Awuah's claims – which seek damages for Coverall's alleged fraudulent conduct and supposed breaches of contract, damages based on Coverall's "misclassification" of Awuah, and rescission of the Franchise Agreement – plainly arise out of and relate to the Franchise Agreement and the relationship between the parties.  *See Prima Paint*, 388 U.S. at 406 (language requiring arbitration of "[a]ny controversy or claim arising out of or relating to th[e] Agreement, or the breach thereof" was "easily broad enough to encompass" plaintiff's claim for fraudulent inducement and rescission).  They are, as a result, arbitrable.

### C. Coverall Is Entitled To A Stay Of This Action Under Section 3 Of The FAA

Because all of the issues raised in Awuah's Complaint are referable to arbitration, Coverall is entitled to a stay of this action pending arbitration.  *See* 9 U.S.C. § 3; *Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 142 (7th Cir. 1978) (court must grant motion to stay when issue is referable to arbitration and party applying for stay is not in default); *Lippus v. Dahlgren Mfg. Co.*, 644 F. Supp. 1473, 1478 (E.D.N.Y. 1986).

### II. Coverall's Time To Respond To The Complaint Should Be Extended Until The Court Addresses Coverall's Motion To Stay Proceedings

If this Court grants Coverall's motion to stay proceedings pending arbitration, this matter will proceed (if at all) in arbitration.  Accordingly, the Court's ruling may obviate the need for Coverall to file an answer or, more likely, a motion to dismiss.  For that reason, and to avoid the possible waste of this Court's and the parties' resources, Coverall respectfully requests, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, that the Court extend Coverall's time to

answer, move or otherwise plead in response to the Complaint until the Court has had an opportunity to address Coverall's motion to stay proceedings pending arbitration.

## **CONCLUSION**

For the foregoing reasons, Coverall's motion (i) pursuant to Section 3 of the Federal Arbitration Act, to stay this action as to plaintiff Pius Awuah pending arbitration, and (ii) pursuant to Rule 6 of the Federal Rules of Civil Procedure, to extend Coverall's time to respond to the claims of plaintiff Pius Awuah, should be granted.

**COVERALL NORTH AMERICA, INC.**,

By its attorneys,

  /s/ Michael D. Vhay
Michael D. Vhay (BBO No. 566444)
Lisa Core (BBO No. 658709)
DLA PIPER US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000

Norman M. Leon
John A. Hughes
DLA PIPER US LLP
203 North LaSalle Street, Suite 1900
Chicago, IL  60601
(312) 368-4000

John Dienelt
DLA PIPER US LLP
1200 Nineteenth Street, NW
Washington, DC  20036
(202) 861-3900

Dated: June 29, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 29, 2007.

          /s/ Lisa S. Core
          Lisa S. Core