**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
)
PIUS AWUAH, NILTON DOS SANTOS,                )
GERALDO CORREIA, DENISSE PINEDA,              )
JAI PREM, AND ALDIVAR BRANDAO,                )
and all others similarly situated,                        )
)
                              Plaintiffs,          )
)
)          Civil Action No. 07-10287
                    v.                                  )
)
COVERALL NORTH AMERICA, INC.,                )
)
                              Defendant.          )
_____ )


**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS[1]**

---

[1]      These motions include:  (1) Defendant Coverall North America, Inc.'s Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) or, in the Alternative, to Dismiss the Claims of Plaintiff Jai Prem; (2) Defendant Coverall North America, Inc.'s Motion to Dismiss the Claims of Plaintiff Geraldo Correia; (3) Defendant Coverall North America, Inc.'s Motion to Stay Proceedings as To Plaintiff Pius Awuah Pending Arbitration and To Extend Time to Respond to the Complaint; (4) Defendant Coverall North America, Inc.'s Motion to Stay Proceedings as to Plaintiff Denisse Pineda Pending Determination of Arbitrability; (5) Defendant Coverall North America, Inc.'s Motion to Transfer Plaintiff Aldivar Brandao's Claims to the Southern District of Florida Pursuant to 28 U.S.C. § 1404 or, in the Alternative, to Dismiss or for a More Definite Statement; and (6) Defendant Coverall North America, Inc.'s Motion for Summary Judgment as to the Claims of Nilton Dos Santos.  Because these motions raise overlapping issues, and because Defendant has attempted to overly complicate this case by filing six separate motions, Plaintiffs are responding to all the motions in this one memorandum.

## **TABLE OF CONTENTS**

ARGUMENT…………………………………………………………………..... 4

I.     THIS COURT MUST STRIKE OR DISREGARD THE IRRELEVANT
       FACTS SET FORTH IN COVERALL'S MOTIONS…….………………. 4

II.    THE ARBITRATION PROVISION IN COVERALL'S FRANCHISE
       AGREEMENT MUST BE STRICKEN BECAUSE IT OPERATES TO
       DENY PLAINTIFFS THE ABILITY TO VINDICATE THEIR RIGHTS……. 5

       A.     Coverall's prohibition on class actions is unenforceable…………. 8

              1.     The law in the First Circuit is clear that class action
                     waivers in arbitration agreements are unenforceable……... 8

              2.     As in <u>Kristian</u> and <u>Skirchak</u>, this Court should hold
                     that the class action waiver in Coverall's arbitration
                     provision is unenforceable………………...………………… 10

       B.     The clauses in Coverall's arbitration provision requiring
              that the workers split the costs of arbitration and
              that the losing party pay the prevailing party's attorneys' fees
              imposes such a high financial risk on cleaning workers
              that it effectively prevents the vindication of rights……………….. 12

              1.     The requirement that the parties split the costs of
                     arbitration is unenforceable…………...…………………….. 13

              2.     The requirement that the losing party pay the
                     prevailing party's attorneys' fees is unenforceable....……… 16

              3.     This showing of prohibitive costs is sufficient to
                     strike these clauses of the arbitration provision..………… 19

       C.     The clauses of Coverall's franchise agreement limiting
              remedies available in arbitration must be stricken……….…..…….21

       D.     The clauses of Coverall's franchise agreement
              providing shorter limitations periods than provided
              by the applicable statutes must be stricken………………………. 23

       E.     The clause of Coverall's franchise agreement making
              arbitrations confidential and barring collateral use
              must be stricken.………………………………………………….. 25

F.   The offending clauses of the arbitration provision
     may not be  severed.………. ……………………………………… 27

III.   THIS CASE IS PROPERLY PLEADED AS A NATIONWIDE
       CLASS ACTION CHALLENGING COVERALL'S COMPANYWIDE
       POLICIES AND PRACTICES, AND, ACCORDINGLY,
       THE CLAIMS OF THE PLAINTIFFS FROM OTHER STATES ARE
       PROPERLY BROUGHT IN THIS COURT………………….…………… 30

IV.    PLAINTIFFS' CLAIMS HAVE BEEN BROUGHT WITHIN THE
       APPLICABLE STATUTES OF LIMITATIONS FOR THEIR CLAIMS,
       AND COVERALL'S SHORTER LIMITATIONS PERIOD MUST BE
       STRICKEN……………………………………………………………… 36

V.     PLAINTIFFS HAVE PLEADED THEIR CLAIMS WITH
       SUFFICIENT PARTICULARITY TO SATISFY THE
       FEDERAL RULES' LIBERAL PLEADING REQUIREMENTS,
       AND THE COMPLAINT ADEQUATELY STATES A CLAIM
       AS TO ALL COUNTS…………………………………………………… 39

       A.   Coverall's arguments as to the sufficiency of Plaintiffs' claims
            are inappropriate and premature……………………………..…... 39

       B.   Plaintiffs have sufficiently pleaded a rescission claim under
            New Jersey and Florida law…………………………………………… 39

       C.   Plaintiffs have sufficiently pleaded a misrepresentation claim
            under Massachusetts, New Jersey and Florida law……………… 42

       D.   Plaintiffs have sufficiently pleaded statutory consumer
            protection claims under New Jersey and Florida law…………….. 43

       E.   Plaintiffs have sufficiently pleaded quantum meruit and
            unjust enrichment claims under New Jersey and Florida law…… 44

       F.   Plaintiffs have sufficiently pleaded wage claims and
            independent contractor misclassification claims under
            New Jersey and Florida law…………………………………………… 45

VI.    COVERALL'S MOTION FOR SUMMARY JUDGMENT AS TO NILTON
       DOS SANTOS MUST BE DENIED AS PREMATURE, AS COVERALL IS
       IN POSSESSION OF THE INFORMATION NECESSARY FOR
       PLAINTIFFS TO OPPOSE THIS MOTION…………………………..…… 46

CONCLUSION…………………………………………………….................... 48

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                        )
PIUS AWUAH, NILTON DOS SANTOS,          )
GERALDO CORREIA, DENISSE PINEDA,        )
JAI PREM, AND ALDIVAR BRANDAO,          )
and all others similarly situated,      )
                                        )
                  Plaintiffs,           )
                                        )
                                        )        Civil Action No. 07-10287
            v.                          )
                                        )
COVERALL NORTH AMERICA, INC.,           )
                                        )
                  Defendant.            )
_____ )

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS

Plaintiffs have brought this case on behalf of a putative nationwide class of

workers who have performed cleaning services for Defendant Coverall North

America, Inc. ("Coverall").  As alleged in the Second Amended Complaint,

Coverall has improperly classified its cleaning workers as independent contractor

"franchisees," requiring the workers to spend substantial sums of money to

purchase so-called "franchises," making improper deductions from the workers'

pay, and otherwise denying the workers the wage protections and other benefits

of employment to which they are entitled by law.[2]  Moreover, Plaintiffs allege that

Coverall misrepresents to the workers the guaranteed amount of monthly income

the "franchises" will provide (knowing that it cannot provide sufficient business to

_____

[2]      In Coverall North America, Inc. v. Com'r of Div. of Unemployment Assistance, 447 Mass.
852 (2006), the Massachusetts Supreme Judicial Court determined that a Coverall franchisee
was an employee, not an independent contractor as Coverall claims its workers to be, and thus
was entitled to unemployment benefits upon the loss of her job.

satisfy these guarantees) and, in fact, provides the workers with substantially

less monthly income than it has promised.[3]

In responding to Plaintiffs' complaint, Coverall has attempted to overly

complicate this case from the outset by filing six separate voluminous motions,

one directed at each of the named plaintiffs in this matter.[4]   In addition to

improperly injecting factual assertions into threshold procedural issues, Coverall

has needlessly complicated this matter by asserting repetitive and overlapping

arguments in these motions.   The issues raised by Coverall's motions that are

actually ripe for review may be boiled down to the following:

(1)     Coverall argues that the claims of Plaintiffs Pius Awuah and Denisse
Pineda must proceed in arbitration, because of an arbitration provision in their
franchise agreements with Coverall.   However, as set forth in Section II, <u>infra</u>,
Coverall's arbitration provision is flawed in so many respects that it wholly denies
parties the ability to vindicate their rights and is therefore unenforceable under
the First Circuit's decision in <u>Kristian v. Comcast Corp.</u>, 446 F.3d 25 (1st Cir.
2006).

(2)     Coverall argues that the claims of the parties who performed work for
Coverall in states other than Massachusetts must be transferred to those states
(specifically, Plaintiffs Jai Prem and Aldivar Brandao).   However, Coverall's
argument is essentially a premature challenge to multi-state class certification.   In
fact, as set forth in Section III, <u>infra</u>, this case has properly been pleaded as a
nationwide class action, challenging Coverall's systemic policies that operate to
deny its cleaning workers their rights under the statutory and common law of the
several states.   As discovery will reveal (and as Plaintiffs will explain in more
detail when they move for class certification), Coverall utilizes uniform practices

---

[3]     Numerous other cases have been brought against Coverall by its franchisees around the
country alleging essentially this same claim.   <u>See</u> Coverall's Franchise Offering Circular, Item 3
(Litigation), attached as Exhibit C.   In this case, Plaintiffs intend to show that these claims are
suitable for resolution through a class action, as they arise out of Coverall's systemic practices--
indeed its business plan--to sell franchises for which it cannot meet its obligations.

[4]     Coverall's tactic in filing these six separate motions is to make this case appear too
complicated to be treated on a classwide basis.   Coverall has a practice of using such tactics in
defending against these claims by trying to separate them out into individual cases and thus
preclude franchisees from working together in a class action.   In a previous case that the
undersigned counsel litigated against Coverall, Coverall filed <i>eight</i> separate federal court actions,
one against each named plaintiff in a putative class action, which were all consolidated into one
case, <u>Machado et al. v. Coverall North America, Inc.</u>, C.A. No. 05-11867.

which make it proper for plaintiffs to bring this case on a nationwide basis. <u>See,</u>
<u>e.g.</u>, <u>In re Relafen Antitrust Litig.</u>, 221 F.R.D. 260, 279 n.18 (D. Mass. 2004)
(certifying nationwide class action).

(3)     Coverall argues that the claims of Plaintiffs Jai Prem and Geraldo Correia
are time-barred under the two-year limitations period in its franchise agreement.
However, because this provision of the franchise agreement operates to deny
parties the ability to vindicate their rights (similar to the arbitration provision), it
must be stricken. <u>See</u> Section IV, <u>infra</u>.

(4)     As to three of the plaintiffs, Jai Prem, Geraldo Correia, and Aldivar
Brandao, Coverall argues that their claims must be dismissed either because
they have not been pleaded sufficiently or because they fail to state a claim. For
the reasons set forth in Section V, <u>infra</u>, Coverall's arguments are without merit.

(5)     Finally, Coverall disavows any relationship to one of the plaintiffs (Nilton
Dos Santos), contending that his claims should be directed instead to a Coverall
subsidiary, despite the fact that he was required to sign Coverall's standard-form
franchise agreement and adhere to Coverall's policies, and he alleges that the
problems he experienced are attributable to Coverall's actions. Coverall's
attempt to distance itself from the violations against this plaintiff must be rejected,
especially at this stage prior to any discovery. <u>See</u> Section VI, <u>infra</u>.

The majority of Coverall's arguments are aimed at the same goal: to
prevent its cleaning workers from being able to vindicate their rights. Through its
attempt to use an arbitration provision that would severely limit franchisees' rights
in a number of ways, its attempt to preclude a multi-state class action, its attempt
to shorten significantly the applicable statutes of limitations, and its attempt to
dismiss claims that have been properly pleaded and for which no discovery has
yet been taken, Coverall seeks to avoid, or substantially limit, the consequences
of its egregious nationwide practices. The Court should reject these attempts,
deny the motions in full, and allow this case to proceed to discovery.

**ARGUMENT**

**I.     THIS COURT MUST STRIKE OR DISREGARD THE IRRELEVANT FACTS SET FORTH IN COVERALL'S MOTIONS.**

As an initial matter, Plaintiffs note that, in its six repetitive motions, Coverall dedicates numerous pages to a skewed recitation of facts that even it concedes are utterly irrelevant to its arguments.  Specifically, Coverall wastes a significant portion of the following briefs on the "facts" as Coverall sees them:

- In its motion to stay the proceeding pending arbitration as to Plaintiff Awuah, Coverall spends seven pages presenting its version of what has occurred between Awuah and Coverall, Def.'s Awuah Mem. at 2-8, even though its argument is that, ""[t]he merits (or lack thereof) of [Awuah's] claims aside," those claims should be submitted to arbitration.

- In its motion to stay the proceeding pending arbitration as to Plaintiff Pineda, Coverall again spends seven pages presenting its version of what has occurred between Pineda and Coverall, Def.'s Pineda Mem. at 1-7, and then argues that, and "[t]he groundless nature of [Pineda's] claims notwithstanding," the merits of her claims should be decided in arbitration.

- In its motion to transfer or dismiss as to Plaintiff Brandao, Coverall recounts its version of the circumstances of the parties' relationship in seven pages and then makes only procedural arguments as to why Brandao's claims should be dismissed, relying almost entirely on citations to the complaint (and referring to the entire seven-page fact statement only twice in the entire argument section of its brief).

Coverall's insertion of these facts into its motions—many of which are highly prejudicial to plaintiffs—is entirely improper.  No discovery has been conducted in this matter, and Plaintiffs have not had the opportunity to obtain the information necessary to refute the assertions made in Coverall's brief.  Moreover, Coverall itself acknowledges that these facts are irrelevant to its motions.

Because the "facts" set forth in Coverall's briefing are irrelevant and prejudicial to Plaintiffs, Plaintiffs request that this Court strike those facts and disregard them in ruling on Coverall's motions.  In order to focus the issues ripe

for consideration at this stage (and because discovery has not yet even begun),

Plaintiffs will not respond at this point to these factual assertions.

## II.   THE ARBITRATION PROVISION IN COVERALL'S FRANCHISE AGREEMENT MUST BE STRICKEN BECAUSE IT OPERATES TO DENY PLAINTIFFS THE ABILITY TO VINDICATE THEIR RIGHTS.

In its motions related to Plaintiffs Awuah and Pineda,[5] Coverall seeks a

stay pending arbitration because the franchise agreement that these plaintiffs

signed contained an arbitration provision.  In this section, Plaintiffs address the

reasons why this arbitration provision is unenforceable as a matter of law.[6]

In Kristian v. Comcast Corp., the First Circuit established that, in

determining the enforceability of an arbitration provision under the Federal

Arbitration Act, courts should apply "a vindication of statutory rights analysis."

446 F.3d 25, 63 (1st Cir. 2006).  This analysis questions "'the presumption that

the arbitration provides a fair and adequate mechanism for enforcing statutory

rights.'"  Id. at 37 (quoting Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith,

Inc., 170 F.3d 1, 14 (1st Cir. 1999)).  As the First Circuit explained:  "Unless the

arbitral forum provided by a given agreement provides for the fair and adequate

enforcement of a party's statutory rights, the arbitral forum runs afoul of this

---

[5]     Coverall has filed a petition to compel arbitration as to Plaintiff Pineda in the federal district court for the District of New Jersey.  Because Plaintiffs have brought this case as a national class action, with plaintiffs from Massachusetts, New Jersey, and Florida, the issue of the unenforceability of Coverall's arbitration provision as to these plaintiffs (and putative class members) is properly before this Court.  Because Coverall's arbitration provision is unenforceable, Plaintiffs intend to file a motion to dismiss the action that Coverall initiated against Pineda in New Jersey.

[6]     Although the argument regarding arbitration is only currently presented for these two plaintiffs (because the other plaintiffs signed previous versions of the franchise agreement that did not contain an arbitration provision), this issue is significant, as Plaintiffs anticipate that Coverall will attempt to use the arbitration provision to defeat class certification on behalf of all of its current franchisees, and former franchisees who signed their contracts within the last five years, since the arbitration provision was inserted.  However, in the event that the Court chooses

presumption and loses it claim as a valid alternative to traditional litigation." Id. The First Circuit's development of this standard was derived from the Supreme Court's statement in Gilmer v. Interstate/Johnson Lane Corp., that "'the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum.'" 500 U.S. 20, 28 (1991) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 (1985)).[7]

Significantly, under this "vindication of statutory rights analysis," it is no longer necessary for courts to determine whether the challenged arbitration provision is unconscionable under traditional state law principles. Kristian, 446 F.3d at 63-64. Thus, whereas previously plaintiffs seeking to challenge an arbitration provision were required to prove both substantive and procedural unconscionability, see, e.g., Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 294 n.13 (1980), they may now avoid an arbitration provision that simply impedes plaintiffs from vindicating their statutory rights. Since this vindication of statutory rights analysis closely mirrors the test for substantive unconscionability, Kristian, 446 F.3d at 63-64, essentially, under Kristian, plaintiffs now merely need to show that the arbitration provision is substantively unconscionable. Thus, Plaintiffs will demonstrate below why Coverall's arbitration provision (and its myriad means of

---

not to address this matter at this stage, the Court could defer this issue by staying the claims of these plaintiffs and allow the remainder of the case to proceed.

[7]     The Gilmer "vindication of statutory rights" analysis set forth most explicitly by the First Circuit in Kristian has also been applied by the Sixth, Ninth, Tenth, Eleventh, and D.C. Circuits, which have recognized that provisions in arbitration agreements that deny parties the benefits of proceeding in court are unenforceable. See Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 663 (6th Cir. 2003); Shankle v. B-G Maintenance Management of Colorado, Inc., 163 F.3d 1230 (10th Cir. 1999); Paladino v. Avnet Computer Technologies, Inc., 134 F.3d 1054, 1062 (11th Cir. 1998); Cole v. Burns Intern. Sec. Services, 105 F.3d 1465, 1482 (D.C. Cir. 1997); Graham Oil Co. v. Arco Products Co., 43 F.3d 1244, 1247-48 (9th Cir. 1993).

impeding plaintiffs' vindication of their rights) may be stricken as a matter of law under <u>Kristian</u>.[8]

Here, the following clauses of Coverall's arbitration provision operate to deny plaintiffs the ability to vindicate their rights:  (1) the prohibition on class actions; (2) the cost-splitting clause; (3) the clause requiring the losing party to pay attorneys' fees; (4) the limitation on remedies; (5) the truncated limitations periods; and (6) the confidentiality clause.  These provisions operate together to render the arbitration provision unenforceable, and, therefore, the entire provision must be stricken.[9]  These clauses are each addressed in the following sections.

---

[8]     If, despite <u>Kristian</u>, the Court were to conclude that the plaintiffs needed to prove procedural unconscionability as well, the plaintiffs would be prepared to do so.  However, since such an analysis is not necessary in light of <u>Kristian</u>, Plaintiffs refrain from making this argument here in order to avoid making these threshold matters more complicated than they need to be.

[9]     It is for this Court, not an arbitrator, to determine the unenforceability of Coverall's arbitration provision.  In <u>Kristian</u>, the First Circuit undertook a detailed analysis to determine which types of challenges to an arbitration provision were appropriate to be determined in the first instance by a court (as opposed to the arbitrator), and the First Circuit concluded that a majority of the challenges raised in that case were appropriately addressed first by a court.  446 F.3d at 37-47, 50-52, 53-55; <u>see also</u> <u>Nagrampa v. MailCoups, Inc.</u>, 469 F.3d 1257, 1264 (9th Cir. 2006) (when plaintiffs challenge an arbitration provision itself—and not just challenge the arbitration provision by virtue of it being part of an otherwise invalid contract—then the federal court should decide whether the arbitration provision is invalid and unenforceable); <u>Chastain v. Robinson-Humphrey Co.</u>, 957 F.2d 851, 854 (11th Cir. 1992) ("[I]f the validity of the agreement to arbitrate is an issue, a district court, not a panel of arbitrators, must decide if the arbitration clause is enforceable against the parties.").

     In this case, because Plaintiffs contend that the entire arbitration provision should be held unenforceable (and that no portion of it should survive through severability, <u>see infra</u> Section II.F), it is appropriate for the Court to address all of Plaintiffs' challenges to the arbitration provision.  Also, it is particularly appropriate for the Court to decide the enforceability of Coverall's arbitration provision, as the arbitration provision contains a clause stating that "[t]he arbitrator or appointed arbitrators shall not alter or otherwise reform the terms of this Agreement," including the arbitration provision itself, which would make it unlikely that an arbitrator would excise portions of the agreement.  Exs. A, B, Section 21.A(6).

### A.   Coverall's prohibition on class actions is unenforceable.

As an initial matter, Coverall's arbitration provision is unenforceable because it prohibits franchisees from pursuing claims on a classwide basis.[10] As set forth below, this clause is unenforceable because it prevents Coverall's cleaning workers from vindicating their rights.

### 1.   The law in the First Circuit is clear that class action waiver in arbitration agreements are unenforceable.

In <u>Kristian</u>, the First Circuit explicitly applied the "vindication of statutory rights" analysis to strike down a class action waiver.  The court noted that the class action "bar has substantial implications for the enforceability of the arbitration agreements," observing that "[t]he bar on class arbitration threatens the premise that arbitration can be 'a fair and adequate mechanism for enforcing statutory rights.'"  446 F.3d 25, 37 (1st Cir. 2006).  Concluding that the class action waiver would prevent individual plaintiffs from seeking redress for antitrust violations and thereby "essentially shield[]" Comcast from liability, the court struck down the class action waiver at issue in <u>Kristian</u>.  <u>Id</u>. at 61.

Similarly, a number of other courts have stricken class action waivers applying unconscionability analysis (which as described above is no longer required under <u>Kristian</u>).  For example, in <u>Skirchak et al v. Dynamics Research Corp</u>., 432 F. Supp. 2d 125 (D. Mass. 2006), Judge Lasker struck a class action waiver in a company's arbitration agreement, in the context of wage claims

---

[10]    The 2004 version, which Plaintiff Pineda signed, states simply that:  "Franchisee and Coverall agree that arbitration shall be conducted on an individual, not a class wide basis."  Ex. A, Section 21.A(11).  The 2006 version, which Plaintiff Awuah signed, elaborates further on this prohibition, stating also that franchisees' arbitration proceedings may not be consolidated.  Ex. B, Section 21.A(11).

brought by two former employees on behalf of all others similarly situated.  In that case, which was decided before <u>Kristian</u>, Judge Lasker presciently observed that "the imposition of a waiver of class actions may effectively prevent DRC employees from seeking redress of FLSA violations." <u>Id</u>. at 181.[11]  The Ninth Circuit has stricken arbitration clauses in at least two cases.  In <u>Ingle v. Circuit City Stores, Inc.</u>, 328 F.3d 1165, 1175 (9th Cir. 2003), an employment discrimination case, the Ninth Circuit struck a class action waiver in a pre-employment arbitration agreement as unconscionable.  The court explained its reasoning as follows:

> We cannot conceive of any circumstances under which an employer would bring a class proceeding against an employee. Circuit City, through its bar on class-wide arbitration, seeks to insulate itself from class proceedings while conferring no corresponding benefit to its employees in return.  This one-sided provision proscribing an employee's ability to initiate class-wide arbitration operates solely to the advantage of Circuit City. Therefore, because Circuit City's prohibition of class action proceedings in its arbitral forum is manifestly and shockingly one-sided, it is substantively unconscionable.

328 F.3d at 1176.  Similarly, in <u>Ting v. AT&T</u>, the Ninth Circuit struck down a class arbitration waiver in AT&T's contract with its customers, noting:  "It is . . . difficult to imagine AT&T bringing a class action against its own customers. . ." 319 F.3d 1126, 1150 (9th Cir. 2003).

At least four state supreme courts have reached similar conclusions.  <u>See</u> <u>Kinkel v. Cingular Wireless LLC</u>, 223 Ill.2d 1, 182, 857 N.E.2d 250, 275 (Ill. 2006); <u>Muhammad v. County Bank of Rehoboth Beach, Delaware</u>, 189 N.J. 1,

---

[11]     Although the <u>Skirchak</u> decision was initially decided on unconscionability grounds, prior to the First Circuit's issuance of <u>Kristian</u>, Judge Lasker later reconfirmed his decision under the <u>Kristian</u> analysis, in denying the defendant's motion for reconsideration.

912 A.2d 88 (N.J. 2006); Discover Bank v. Superior Court, 113 P.3d 1100, 1108,

30 Cal. Rptr. 3d 76 (2005); Leonard v. Terminix Int'l Co., 2002 WL 31341084, at

*8 (Ala. Oct. 18, 2002).[12]

> **2.    As in Kristian and Skirchak, this Court should hold that the class action waiver in Coverall's arbitration provision is unenforceable.**

The First Circuit's decision in Kristian and the district court's decision in

Skirchak (and the decisions by other courts striking class arbitration waivers)

reflected an appropriately skeptical view of class action waivers in arbitration

policies, and the rationale for concluding that the class action waivers in those

cases were unenforceable applies with at least equal force to this case.  In

Skirchak, the court observed that "the class action waiver is not only unfair to

DRC employees, but also removes any incentive for DRC to avoid the type of

---

[12]    Many other federal and state lower courts have also stricken class action waivers in arbitration agreements, including:  Cooper v. QC Financial Services, Inc., 2007 WL 974100 (D. Ariz. Mar. 30, 2007); Stern v. Cingular Wireless Corp., 453 F. Supp. 2d 1138 (C.D. Cal. 2006); Doerhoff v. Gen. Growth Props. Inc., 2006 WL 3210502 (W.D. Mo. Nov. 6, 2006); Winig v. Cingular Wireless LLC, 2006 WL 2766007 (N.D. Cal. Sept. 27, 2006); Wong v. T-Mobile USA, Inc., 2006 WL 2042512, at *5 (E.D. Mich. July 20, 2006); Lowden v. T-Mobile USA Inc., 2006 WL 1009279 (W.D. Wash. Apr. 13, 2006); In re Frascella Enterprises, Inc., 349 B.R. 421 (Bkrtcy. E.D. Pa. 2006); Luna v. Household Finance Corp., 236 F. Supp. 2d 1166, 1178-79 (W.D. Wash. 2002) ("Here, the prohibition on class actions allows the Arbitration Rider to be 'used as a sword to strike down access to justice . . .'"); Comb v. Paypal, Inc., 218 F. Supp. 2d 1165 (N.D. Cal. 2002); Lozada v. Dale Baker Oldsmobile, Inc., 91 F. Supp. 2d 1087, 1105 (W.D. Mich. 2000); In re Knepp, 229 B.R. 821, 842 (Bkrtcy. N.D. Ala. 1999); Reuter v. Davis, 2006 WL 3743016 (Fla. Cir. Ct. Dec. 12, 2006); Reuter v. Davis, 2006 WL 3743016 (Fla. Cir. Ct. Dec. 12, 2006); Schwartz v. Alltel Corp., 2006 WL 2243649, at *5 (Ohio App. June 29, 2006); Cohen v. DirecTV Inc., 142 Cal. App. 4th 1442, 48 Cal.Rptr.3d 813  (Cal. App. 2006); Thibodeau v. Comcast Corp., 912 A.2d 874 (Pa. Super. 2006); Whitney v. Alltel Communications, Inc., 173 S.W.3d 300 (Mo. App. W.D. 2005); Eagle v. Fred Martin Motor Co., 2004 WL 344135 (Ohio Ct. App. Feb. 25, 2004); State ex rel Dunlap v. Berger, 211 W.Va. 549, 567 S.E.2d 265 (2002); Powertel, Inc. v. Bexley, 743 So. 2d 570, 576 (Fla. Dist. Ct. App. 1999).

Although some courts have upheld class action waivers in arbitration agreements, the clear trend since the First Circuit's decision in Kristian is to strike those provisions down.  Indeed, thirteen of sixteen courts addressing class arbitration waivers since Kristian have stricken those waivers.  See cases cited above; but see Ornelas v. Sonic-Denver T, Inc., 2007 WL 274738 (D. Colo. Jan. 29, 2007); Sherr v. Dell, Inc., 2006 WL 2109436 (S.D.N.Y. Jul. 28, 2006); Tillman v. Commercial Credit Loans, Inc., 629 S.E.2d 865 (N.C. App. 2006).

conduct that might lead to class action litigation in the first instance."  432 F. Supp. 2d at 181.

In precisely the same way, Coverall's class action waiver is unfair to its cleaning workers.  Indeed, if the cleaning workers cannot bring these claims as a class, most will not bring them at all.  They may not have the time, sophistication, and financial resources to pursue their claims; they may be unable to find competent counsel to take such claims on an individual basis; and they may rightly fear retaliation from Coverall if they institute an individual action against it.[13]

Clearly the only reason that a company, such as Coverall, would implement and attempt to enforce a waiver of class claims when faced with allegations of widespread violations would be to limit its liability substantially and escape the repercussions of having violated the law with respect to numerous workers, many of whom may lack the incentive and resources to challenge the violations.

Coverall's class action waiver also "removes any incentive" for Coverall to avoid the violations alleged in this case.  If all Coverall needed to fear were the individual claims of a resolute few cleaning workers who overcame the obstacles to press their claims then there would be no incentive for the company to comply with the laws as affecting large numbers of its workers, since it would undoubtedly

---

[13]     Plaintiffs allege that the cleaning workers are actually Coverall's employees who have been misclassified as independent contractor franchisees.  See Coverall North America, Inc. v. Com'r of Div. of Unemployment Assistance, 447 Mass. 852 (2006) (holding that Coverall franchisee was an employee, not an independent contractor as Coverall claimed).  However, regardless of whether they are classified as employees or franchisees, Plaintiffs have alleged that the cleaning workers are reliant on Coverall to provide them with business.  Accordingly, like employees, Coverall's cleaning workers would undoubtedly be justified in being concerned that, if they brought a claim against Coverall, it may retaliate against them by taking cleaning accounts from them and refusing to provide additional business, thereby depriving the workers of their livelihood.

be cheaper to pay off those individual claims than to change the policies and practices which violated the workers' rights.

Striking down Coverall's class action waiver would also be in keeping with the importance of relief by way of class action.  Indeed, the United States Supreme Court has long recognized that, "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device."  Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980).  Moreover, cases involving standard form contracts signed by multiple parties, which invariably raise similar issues for all potential plaintiffs, "'present the classic case for treatment as a class action.'"  Eldridge v. Provident Companies, Inc., 2000 WL 289640, at *5 (Mass. Super. 2000) (quoting Kleiner v. First Natl. Bank of Atlanta, 97 F.R.D. 683, 692 (1983)).

Accordingly, because the class action waiver in Coverall's arbitration provision prevents the vindication of the cleaning workers' rights, it must be stricken.

**B.    The clauses in Coverall's arbitration provision requiring that the workers split the costs of arbitration and that the losing party pay the prevailing party's attorneys' fees imposes such a high financial risk on cleaning workers that it effectively prevents the vindication of rights.**

Coverall's arbitration provision is also unenforceable because it requires the workers to split the costs of arbitration and it provides that the losing party

pays attorneys' fees to the prevailing party.[14]  As shown below, these provisions

create an extreme disincentive for Coverall's franchisees to pursue claims

against it; if enforced, they would thus allow Coverall to continue its widespread

violations with little fear of liability.

> **1.      The requirement that the parties split the costs of arbitration is unenforceable.**

As the United States Supreme Court has noted, "the existence of large

arbitration costs could preclude a litigant . . . from effectively vindicating her federal

statutory rights in the arbitral forum."  Green Tree Financial Corp. v. Randolph, 531

U.S. 79, 90 (2000).  Indeed, as the D.C. Circuit has recognized, the Supreme

Court has "endorsed a system of arbitration in which employees are not required

to pay for the arbitrator assigned to hear their statutory claims."  Cole v. Burns

Intern. Sec. Services, 105 F.3d 1465, 1484 (D.C. Cir. 1997) (citing Gilmer).

Relying on the Supreme Court's reasoning in Gilmer and Green Tree,

numerous courts have invalidated arbitration agreements requiring plaintiffs to split

the costs of arbitration.  Specifically, the D.C., Fourth, Sixth, Ninth, Tenth, and

Eleventh Circuits have held that cost-splitting provisions in arbitration agreements

are unenforceable:

- **Morrison v. Circuit City Stores, Inc., 317 F.3d 646 (6th Cir. 2003)**:  The court held that "[a] cost-splitting provision should be held unenforceable whenever it would have the 'chilling effect' of deterring a substantial number of potential litigants from seeking to vindicate their statutory rights."  Id. at 663.  In making its determination, a court should look to "average or typical arbitration costs, because this is the kind of information that potential litigants will take into account in deciding whether to bring their claims in the arbitral forum" and should weigh the potential costs of litigation "in a realistic

---

[14]      These provisions are included in the 2004 and 2006 versions of the arbitration agreement signed by both Plaintiffs Pineda and Awuah.  See Exs. A and B, Sections 21.A(3), 21.C.

manner," taking into account that many such claims are taken by attorneys on a contingency fee basis, resulting in "minimal costs in the judicial forum." Id. at 664; see also Floss v. Ryan's Family Steak Houses, Inc., 211 F.3d 306, 314 (6th Cir. 2000) (holding that a fee structure requiring employee to pay half of arbitrators' fees "could potentially prevent an employee from prosecuting a federal statutory claim against an employer").

- **Ingle v. Circuit City Stores, Inc.,** 328 F.3d 1165 (9th Cir. 2003):  The court struck down the cost-splitting provision in the employer's arbitration agreement as substantively unconscionable.

- **Bradford v. Rockwell Semiconductor Systems, Inc.,** 238 F.3d 549 (4th Cir. 2001):  The court engaged in extensive analysis of the application of the "undisputed" principle that "fee splitting can render an arbitration agreement unenforceable where the arbitration fees and costs are so prohibitive as to effectively deny the employee access to the arbitral forum." Id. at 554.  The court concluded that courts must focus on "the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." 238 F.3d at 556.[15]

- **Shankle v. B-G Maintenance Management of Colorado, Inc.,** 163 F.3d 1230 (10th Cir. 1999):  The court held that, because arbitration would likely cost the worker "between $1,875 and $5,000," the mandatory arbitration clause "failed to provide an accessible forum in which he could resolve his statutory rights" and was therefore unenforceable under the Federal Arbitration Act. Id. at 1233, 1235.  The court expressed concern with costs of arbitration as compared with court litigation, noting that the arbitration clause placed the worker "between the proverbial rock and a hard place—it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum." Id.

- **Paladino v. Avnet Computer Technologies, Inc.,** 134 F.3d 1054 (11th Cir. 1998):  The court struck down an arbitration agreement under which the employee was potentially liable for at least half of the "hefty cost of arbitration," including "steep filing fees." Id. at 1062.  The court "consider[ed] costs of this magnitude a legitimate basis for a conclusion that the clause does not comport with statutory policy." Id.

- **Cole v. Burns Intern. Sec. Services,** 105 F.3d 1465 (D.C. Cir. 1997):  Because "arbitration is supposed to be a reasonable substitute for a judicial forum, it would undermine Congress's intent to prevent employees who are

---

[15]     The court concluded that the cost-splitting provisions did not deter the plaintiff from arbitrating in Bradford for the following reasons:  (1) the employee had initiated the arbitration himself; (2) he conceded "that he received a full and fair arbitration hearing that adjudicated his case on the merits"; and (3) he was earning a base salary of $115,000 at the time of his discharge. Id. at 558, n.6.

14

seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court." Id. at 1484.[16]

Applying the standards set forth by the federal circuit courts in the cases described above, the cost-splitting clause of Coverall's arbitration provision must be stricken.  If required to proceed in arbitration, each worker would be responsible for the following arbitration-related costs (and individually if they are not permitted to proceed on a class basis):

- Administrative fees to the American Arbitration Association (including initial filing fees and case service fees), which range from approximately $4,000 to $16,000, see National Rules for the Resolution of Employment Disputes, http://www.adr.org/sp.asp?id=24212;  and

- Arbitrator fees ranging from  approximately $800 to $2,200 per day and which must be paid for the arbitrator's time before and at the hearing and for the time it takes the arbitrator to research and issue his decision.  See Alexander v. Anthony Intern., L.P., 341 F.3d 256, 261-62 (3d Cir. 2003) (discussing AAA arbitrator rates).

In contrast, if this action proceeds in court, Plaintiffs are collectively responsible for a minimal filing fee of $250.  28 U.S.C. § 1914(a).  It is true that the parties will also incur expenses during discovery, but these expenses would be incurred during discovery in the arbitrations as well.  However, because they are proceeding collectively and, if class certification is granted, on behalf of a class in federal court, they share the burden of discovery expenses, whereas each worker would have to bear the costs of arbitration alone if required to proceed individually under Coverall's arbitration agreement.  See Cole, 105 F.3d at 554 (noting that

---

[16]     The arbitration agreement at issue in Cole was valid only because the court interpreted that agreement as requiring the employer to pay all of the arbitrator's fees.   105 F.3d at 1485.

arbitrators' fees are "unlike anything" a party would have to pay in court because "the services of a judge" are free).[17]

### 2.     The requirement that the losing party pay the prevailing party's attorneys' fees is unenforceable.

Coverall's arbitration provision imposes additional significant risks on parties initiating arbitration that they would not be exposed to in court—namely, that they will have to pay all of Coverall's litigation costs, including attorneys' fees, if they lose.  In contrast, several of the statutes under which plaintiffs allege claims provide for plaintiffs to recover attorneys' fees and costs from the defendant if they are successful, but there is no corresponding provision allowing defendants to recover from plaintiffs.  See, e.g., Mass. Gen. L. c. 93A § 11; Mass. Gen. L. c. 149 § 150; N.J. Stat. Ann. 34:11-56a25.[18]

This difference makes sense:  the goals of the wage laws and laws governing unfair and deceptive practices are to encourage plaintiffs to initiate actions to vindicate their rights.  Those goals are served by reimbursing prevailing plaintiffs for their costs associated with bringing these actions.  In contrast, to

---

[17]     The disparity in the costs of arbitration and court litigation is compounded by the fact that, under the arbitration agreement as written, Coverall's cleaning workers may not be able to recover much of the relief to which they claim they are entitled.  See Section II.C, infra.  Thus, in addition to being required to pay thousands of dollars in arbitration fees, and being at risk of having to pay hundreds of thousands of dollars in Coverall's attorneys' fees, the workers may be grossly limited in the scope of relief available in arbitration—the contracts limit their recovery to 3 times the monthly volume of promised business or only a recovery of their initial franchise fee, a far cry from the full relief which they are entitled to seek under statutory and common law (which would include recovery for their full losses, for punitive or treble damages, and recovery of their attorneys' fees and costs).  In contrast, for a fraction of the cost, in court Plaintiffs can seek all relief to which they would be entitled under the law.

[18]     Notably, though Coverall has styled its provision regarding attorneys' fees as a mutual obligation, the provision is not mutual.  The cleaning workers would not be required to pay Coverall's costs and fees in court if they lose, while Coverall would have this same obligation in court.  See, e.g., Bercovitch v. Baldwin School, Inc., 191 F.3d 8, 10-11 (1st Cir. 1999) (noting that, under several federal statutes, defendants are to be awarded attorneys' fees only when "the

expose plaintiffs to the risk of having to pay the defendants' attorneys' fees and costs would have the effect of chilling the vindication of rights, as wronged individuals would be less likely to assert their rights because of the risk of owing the defendant hundreds of thousands of dollars in legal fees. See, e.g., Sinyard v. Commissioner of Internal Revenue, 268 F.3d 756, 763 (9th Cir. 2001) ("[T]he purpose of fee-shifting provisions, like the one in the ADEA, is not only to permit plaintiffs without resources to pursue claims but to encourage meritorious civil rights litigation by defraying its cost."); see also Bercovitch v. Baldwin School, Inc., 191 F.3d 8, 10-11 (1st Cir. 1999) ("A successful plaintiff vindicates an important congressional policy and is awarded fees against a violator of [federal] law. Neither is true of a successful defendant.") (internal citations and quotation marks omitted).

The Kristian court struck an even less objectionable provision, which provided that parties were responsible for their own costs and attorneys' fees. The court held that "the ban on the recovery of attorney's fees and costs in the arbitration agreements would burden Plaintiffs here with prohibitive arbitration costs, preventing Plaintiffs from vindicating their statutory rights in arbitration." 446 F.3d at 52-53. Similarly, other courts have also stricken less punishing cost-shifting provisions in arbitration agreements. For example, in Ingle, the Ninth Circuit struck down a provision in the employer's arbitration agreement that gave the arbitrator discretion to require the employee to pay the employer's share of the arbitrator's costs if she did not prevail. The court explained that "the fact that an

---

plaintiff's suit was totally unfounded, frivolous, or otherwise unreasonable," a "rare" circumstance).

employee could be held liable for Circuit City's share of the arbitration costs should she fail to vindicate employment-related claims renders this provision substantively unconscionable."  328 F.3d at 1178.  In striking down a provision of an employment arbitration agreement requiring the losing party pay the prevailing party's costs in <u>Veliz v. Cintas Corp.</u>, the court explained that, "while there may be some facial 'fairness' . . . for the loser to pay costs," the reality is that such a risk would serve to deter workers from bringing cases, especially "when the dispute involves the employee's livelihood and, hence, the employee's ability to meet daily expenses, let alone the expenses of arbitrating the dispute."  2004 WL 2452851, at *14 (N.D. Cal. Apr. 5, 2004).

Notably, the provisions held unenforceable in <u>Ingle</u> and <u>Veliz</u> were not nearly as problematic as the clause in Coverall's arbitration provision—those provisions put the losing party at risk of paying the prevailing party's costs only, while Coverall's provision *requires* that the losing party pay both costs of arbitration *and* attorneys' fees.

Indeed, Coverall's requirement that the losing party pay the prevailing party's litigation costs and attorneys' fees could expose plaintiffs to hundreds of thousands of dollars in liability, simply for not prevailing in their case.  Attorneys from the law firm representing Coverall (DLA Piper, formerly Piper Rudnick) have previously sought attorneys' fees at an hourly rate of $450.  <u>See</u> <u>Microsoft Corp. v. T & S International Corp.</u>, 2004 WL 407008, at *1 (N.D. Ill. Mar. 3, 2004) (attorneys at Piper Rudnick sought attorneys' fees at rates of $265 to $450 per hour).

The requirement that the cleaning workers split the exorbitant costs of arbitration and the risk that they could be liable to Coverall for as much as hundreds of thousands of dollars in attorneys' fees if they do not prevail effectively bars them from litigating their claims.  It costs thousands of dollars in administrative fees to the AAA to pursue claims in arbitration, as opposed to the statutorily mandated $250 filing fee in federal court, and arbitrators charge hundreds of dollars an hour for their time while the court's services are free.  28 U.S.C. § 1914(a).  The majority of Coverall's workers simply will not have the money to pay arbitration expenses, as Coverall was certainly well aware when it created it arbitration policy.  To prevent the result of essentially barring the workers' statutory claims as too expensive, this Court should hold that the provisions requiring the plaintiffs to split the costs of arbitration and to pay Coverall's attorneys' fees if they do not prevail void and unenforceable.

### 3.    This showing of prohibitive costs is sufficient to strike these clauses of the arbitration provision.

Although Coverall may attempt to argue that Plaintiffs' showing on the prohibitive costs of arbitration is insufficient under Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79 (2000), that argument is without merit.  In Green Tree, the Court held that the party seeking to invalidate an arbitration agreement "bears the burden of showing the *likelihood* of incurring such costs." Id. at 92 (emphasis added).  The Court's reference to the "likelihood of incurring" arbitration costs related not to whether those costs would be prohibitive but whether the arbitration agreement in question required the party to incur those costs at all.  Id. at 89-90.  Randolph (the party opposing arbitration in Green

Tree) failed to meet that burden because the arbitration agreement in that case "was silent with respect to payment of filing fees, arbitrators' costs, and other arbitration expenses," Id. at 89, and she had failed to demonstrate that she would be responsible for such fees and costs under the agreement.  For this reason alone, the Court denied Randolph's request to invalidate the arbitration agreement.[19]

Looking at Coverall's arbitration provision itself, without more, there can be no question that Plaintiffs have satisfied the Green Tree standard.  Unlike the arbitration agreement in Green Tree, which was silent as to who would bear fees and costs, Coverall's arbitration provision undisputedly requires the parties to split costs and requires the losing party to reimburse the prevailing party for litigation costs.  See Exs. A and B, Sections 21.A(3), 21.C.  Because the arbitration agreement explicitly requires the workers to bear these costs, Plaintiffs have satisfied their burden under Green Tree and have gone well past the contention deemed insufficient in that case "that the arbitration agreement's silence with respect to costs and fees creates a 'risk' that she will be required to bear prohibitive arbitration costs."  531 U.S. at 90.  Notably, the court in Kristian rejected an argument by the defendant there that the court should remand to the district court for further factual development on the issue of costs.  The court explained, "[w]e see no reason to ignore the obvious."  446 F.3d at 52.  Similar reasoning should apply here.

_____

[19]     The Court in Green Tree then went on to note in *dictum* that it "believe[d]" that a party opposing arbitration would also have to show that "arbitration would be prohibitively expensive." Id. at 92.  However, the Court declined to set any standard for "[h]ow detailed the showing of prohibitive expense must be," because that issue was not before the Court.  Id.

**C.     The clauses of Coverall's franchise agreement limiting remedies available in arbitration must be stricken.**

Perhaps most egregiously, Coverall has attempted to use its arbitration provision to severely limit the remedies that plaintiffs could obtain through filing claims against the company.  Section 8 of the franchise agreement states that a franchisee's "sole remedy" for Coverall's failure to provide sufficient business shall be a refund of three times the amount of promised monthly business, less any payments owed by franchisee for the purchase of the franchise.  Exs. A, B, Section 8.A, C.  The agreement makes clear that the arbitrator is limited to awarding this relief.  Exs. A, B, Section 21.A(6) ("[t]he arbitrator or appointed arbitrators shall not alter or otherwise reform the terms of this agreement, or award any relief or grant any remedy not provided for in this Agreement or specifically excluded by this Agreement.").  The agreement also specifically prohibits the arbitrator from awarding exemplary or punitive damages.  Exs. A, B, Section 21.A(7).

These provisions sharply limit the relief available to Coverall's cleaning workers through arbitration and bar the workers from obtaining the relief to which they would be entitled in court for the claims alleged in this case.  For example, for the statutory claims alleged in the complaint, Coverall's cleaning workers may recover double or treble damages, see, e.g., Mass. Gen. L. c. 149 § 150; Mass. Gen. L. c. 93A § 11; N.J. Stat. Ann. 56:8-19, punitive damages, see Rollins, Inc. v. Butland, 951 So. 2d 860, 880 (Fla. App. 2d Dist. 2006) (citing Fl. Stat. Ann. 768.72), and full disgorgement of profits, N.J. Stat. Ann. 56:8-2.11, none of which is available under Coverall's arbitration provision.

The Supreme Court has recognized the unenforceability of arbitration provisions limiting available relief.  In <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, the Court stated that if the arbitration agreement at issue had operated "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."  473 U.S. 614, 637 (1985).

The Sixth, Ninth and Eleventh Circuits have stricken arbitration agreements that explicitly limited the relief to which the plaintiffs would be entitled in court:

- **<u>Morrison v. Circuit City Stores, Inc.</u>,  317 F.3d 646 (6th Cir. 2003)**:  The court concluded that the provision of the arbitration agreement limiting recoverable damages was unenforceable under <u>Gilmer</u>.  <u>Id</u>. at 670-71.

- **<u>Paladino v. Avnet Computer Technologies, Inc.</u>, 134 F.3d 1054 (11th Cir. 1998)**:  In addition to deeming the cost-splitting provision to be invalid, the Eleventh Circuit also based its decision to strike down the arbitration agreement on the fact that the arbitration agreement limited the available relief to damages for breach of contract, effectively foreclosing the plaintiff from pursuing his Title VII claim.  <u>Id</u>. at 1062.  The court held:  "the arbitrability of [federal statutory] claims rests on the assumption that the arbitration clause permits relief equivalent to court remedies[, and w]hen an arbitration clause has provisions that defeat the remedial purpose of the statute, . . . the arbitration clause is not enforceable."  <u>Id</u>.

- **<u>Graham Oil Co. v. Arco Products Co.</u>, 43 F.3d 1244 (9th Cir. 1993)**:  The Ninth Circuit refused to enforce an arbitration clause that prohibited franchisees from obtaining relief to which they were entitled by statute, namely exemplary damages, and attorneys' fees.  <u>Id</u>. at 1247-48; <u>see also</u> <u>Ingle</u>, 328 F.3d at 1179 ("Because the remedies limitation improperly proscribes available statutory remedies, we again conclude that it is substantively unconscionable.").

Here, not only does the arbitration provision prevent Coverall's cleaning workers from obtaining entire categories of damages to which they are entitled

under the claims alleged in this case,[20] but it imposes a quite severe restrictive

on even the compensatory damages for which workers are eligible.  Under the

"sole remedy" provision, cleaning workers who purchase so-called franchises for

tens of thousands of dollars for guarantees of $2,000 to $3,000 per month in

income, 2d Am. Compl. ¶¶ 25-29, would be entitled to only a one-time payment

of $6,000 to $9,000, which often would not even suffice to reimburse them for

their initial franchise fees.  In other words, the workers would receive three

months' worth of payment for accounts that they expected to service indefinitely

and would receive no reimbursement at all for their substantial initial franchise

fees.  As such, these provisions of Coverall's franchise agreement operate to

circumscribe available remedies so severely that the workers are unable to

vindicate their rights.

> **D.    The clauses of Coverall's franchise agreement providing shorter limitations periods than provided by the applicable statutes must be stricken.**

Coverall's franchise agreement establishes a two-year limitation period for

all claims relating to the contract or the relationship between the parties.  Exs. A,

B, Section 22, 21.A(9).  This shortened limitation period clearly impinges on the

cleaning workers' rights, as the claims raised in the complaint have longer

limitations periods.[21]

---

[20]     For example, this clause would likely foreclose the workers' ability to obtain treble damages under the Massachusetts wage and consumer protection laws, as they are essentially punitive damages.  See Goodrow v. Lane Bryant Inc., 432 Mass. 165, 178 (2000) ("[T]reble damages . . . 'are essentially punitive in nature.'").

[21]     In Kristian, the First Circuit declined to consider the enforceability of a clause of the arbitration agreement in question that required all claims to be filed within one year, in contravention of the substantially longer limitations periods in the statutes under which the plaintiffs had brought suit.  There, the issue was whether the limitations period in the arbitration

As the Supreme Court noted in <u>Gilmer</u>, "a party does not forego [statutory] substantive rights" by agreeing to arbitrate but "submits to their resolution in an arbitral rather than a judicial, forum."  500 U.S. at 26.  In its provision of a two-year limitation period, the arbitration policy does much more than select the forum in which Plaintiffs are to pursue their claims; it bars them from pursuing claims that would be available to them in court.  In <u>Graham Oil v. Arco Prods. Co.</u>, the Ninth Circuit held unenforceable a limitation period in an arbitration agreement because it "expressly forfeits [the plaintiff's] statutorily-mandated right to a one-year statute of limitations on its claims" against the defendant.  43 F.3d 1244, 1248-49 (9th Cir. 1994).  More recently, the Ninth Circuit struck down a one-year limitation period in an employer's arbitration policy, noting "particular concern[]" that the one-year period would bar claims asserted under a "continuing violation" theory.  <u>Davis v. O'Melveny & Myers</u>, 485 F.3d 1066, 1077 (9th Cir. 2007); <u>see also</u> <u>Ingle</u>, 328 F.3d at 1175 (because "the benefit of [the arbitration agreement's one-year limitation period] flows only to Circuit City," the employer, the provision was unenforceable).

---

agreement could be tolled under an "ongoing injury" theory, and the court declined to address that question because it required "an examination of the 'merits of the case,' i.e., the facts, the province of the arbitrator."  446 F.3d at 44.

    Here, on the other hand, the analysis of whether the limitation period cuts off cleaning workers' rights is straightforward—as written, the two-year period denies the workers the right to pursue many of their statutory and common law claims.  Moreover, although some of those claims may fall into the limitations period under an "ongoing injury" theory, others relate to specific events (e.g., contract formation), and those claims would unquestionably be curtailed by the limitation period in the franchise agreement.  Thus, this issue is properly addressed by the Court in determining the enforceability of Coverall's arbitration provision.

    Even if, in isolation, the Court were to hold under <u>Kristian</u> that the enforceability of the shortened limitations period were for an arbitrator to decide, Plaintiffs contend here that Coverall's entire arbitration provision should be stricken, including the limitation period, since the unenforceable provisions may not in this case be severed.  <u>See</u> Section II.F, <u>infra</u>.  Additionally, Plaintiffs' argument that the shortened limitations period is unenforceable also applies to the plaintiffs whose franchise agreements do not contain arbitration provisions, as Coverall also

The limitations period in the arbitration policy is similarly unenforceable because it prevents Plaintiffs from taking advantage of the longer statutory limitations periods for the claims alleged in the complaint.  <u>See, e.g.,</u> Mass. Gen. L. c. 149 § 150 (three-year limitation period for claims under wage laws); Mass. Gen. L. c. 260 § 2 (six-year statute of limitations for breach of contract claims); Mass. Gen. L. c. 260 § 5A (four-year limitation period for claims brought under Chapter 93A); N.J. Stat. Ann. 2A:14-1 (six-year statute of limitations for claims under New Jersey Consumer Fraud Act); N.J. Stat. Ann. 2A:14-1 (six-year statute of limitations for contract claims); Fl. Stat. Ann. 95.11(3)(f) (four-year statute of limitations for claims under Florida Deceptive and Unfair Trade Practices Act) ; Fl. Stat. Ann. 95.11(2)(b) (five-year statute of limitations for breach of contract claims); Fl. Stat. Ann. 95.11(3) (four-year statute of limitations for rescission of contract, misrepresentation, and quantum meruit claims).  As such, the limitation period impermissibly prevents Plaintiffs from being able to vindicate their rights fully.

> **E.  The clause of Coverall's franchise agreement making arbitrations confidential and barring collateral use must be stricken.**

Finally, Plaintiffs challenge as unenforceable the portions of Coverall's arbitration provision which require that arbitration proceedings be kept confidential and prohibits the collateral use of any arbitration decision in cases brought by other cleaning workers.  <u>See </u>Exs. A, B, Section 21.A(13).

The Ninth Circuit has stricken down similar provisions on at least two occasions.  In <u>Ting v. AT&T</u>, the court noted that "confidentiality provisions

---

seeks dismissal of those workers' claims as untimely.  <u>See</u> Section V, <u>infra</u>.

usually favor companies over individuals." It explained that, generally, "because companies continually arbitrate the same claims, the arbitration process tends to favor the company . . . [I]f the company succeeds in imposing a gag order, plaintiffs are unable to mitigate the advantages in being a repeat player" by reviewing previous arbitration awards with respect to the company. 319 F.3d 1126, 1151-52 (9th Cir. 2003). In contrast:

> [The company] has placed itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, [the company] accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract. Further, the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case [against the company].

Id. at 1152. The Ninth Circuit reached a similar conclusion in its recent <u>Davis</u> decision, noting the unfairness of a confidentiality provision governing the arbitration of employment-related disputes between the law firm O'Melveny & Myers and its employees. 485 F.3d at 1078-79.

As in <u>Ting</u> and <u>Davis</u>, the confidentiality clause in Coverall's arbitration provision is unenforceable because it unfairly favors Coverall. Coupled with the class arbitration waiver, Coverall's confidentiality clause operates to compartmentalize cleaning workers' claims and to deny workers the benefit of any previous arbitrators' decisions on identical claims relating to the enforceability of provisions of the franchise agreement and Coverall's systemic practices with respect to providing cleaning accounts to its workers and paying workers for their services. In this way, Coverall can take advantage of its superior position and resources by retrying the same issues over and over

without ever allowing its workers the benefit of this repeat-player advantage.

This provision thus provides another means of reducing the likelihood that

Coverall would ever be held accountable for its systemic legal violations.[22]

This clause is also contrary to the purpose of the doctrine of collateral

estoppel.  As the Supreme Court has explained:  "To preclude parties from

contesting matters that they have had a full and fair opportunity to litigate

protects their adversaries from the expense and vexation attending multiple

lawsuits, conserves judicial resources, and fosters reliance on judicial action by

minimizing the possibility of inconsistent decisions."  <u>Montana v. United States</u>,

440 U.S. 147, 153-54 (1979).

The clause making arbitrators' decisions confidential and prohibiting

collateral use of those decisions places yet another obstacle in the path of

cleaning workers attempting to vindicate their rights in their claims against

Coverall.  Therefore, it must be stricken.

**F.    The offending clauses of the arbitration provision may not be
severed.**

Because of the sheer volume of objectionable clauses in Coverall's

arbitration provision, as set forth above, the arbitration provision must be stricken

in its entirety.  Severing the offending provisions will not suffice.  Striking the

entire arbitration provision is consistent with the majority of cases holding that

---

[22]     As noted earlier, the claims raised in this case are essentially the same claims that a
number of Coverall's franchisees have brought against it in the past.  <u>See</u> Ex. C (Franchise
Offering Circular, Item 3 (Litigation)).  These previously asserted claims include failure to provide
all monthly business promised in franchise agreement, removal of cleaning accounts without
justification, underbidding for cleaning accounts, use of "high-pressure sales techniques,"
misrepresentation, breach of contract, rescission of contract, etc.  Through a number of the

arbitration agreements are unenforceable because of particular problematic provisions.  For example, in <u>Davis</u>, the Ninth Circuit refused to sever the four unconscionable provisions in the arbitration agreement at issue, explaining that "[d]espite a 'liberal federal policy favoring arbitration agreements,' a court cannot rewrite the arbitration agreement for the parties."  485 F.3d at 1084 (internal citations omitted).  Similarly, in <u>Nagrampa</u>, the Ninth Circuit held that the flaws in an arbitration provision in the parties' franchise agreement could not be remedied by severance.  The court held that "[t]he MailCoups arbitration provision is so permeated by substantive unconscionability that it cannot be cured by severance or any other action short of rewriting the contract."  469 F.3d at 1293.

Other circuits have reached similar conclusions.  In <u>Perez v. Globe Airport Sec. Services, Inc.</u>, the Eleventh Circuit refused to sever an unenforceable cost-splitting provision of an arbitration agreement, explaining:

> If an employer could rely on the courts to sever an unlawful provision and compel the employee to arbitrate, the employer would have an incentive to include unlawful provisions in its arbitration agreements. Such provisions could deter an unknowledgeable employee from initiating arbitration, even if they would ultimately not be enforced. It would also add an expensive procedural step to prosecuting a claim; the employee would have to request a court to declare a provision unlawful and sever it before initiating arbitration. Including an unlawful provision would cost the employer little, particularly where, as here, the arbitration agreement provides the employee must bear the employer's court costs and attorneys' fees incurred defending the agreement if arbitration is challenged and the employer prevails.

253 F.3d 1280, 1287 (11th Cir. 2001) (opinion vacated pursuant to stipulation of dismissal by parties, 294 F.3d 1275 (11th Cir. 2002).  In <u>Alexander v. Anthony</u>

---

methods challenged here, Coverall has succeeded so far in limiting such repeated claims to those of these relatively few individuals.

Intern., L.P., the Third Circuit held that the limitation period, the limitation on remedies, and the provision requiring the losing party to pay arbitration expenses in an arbitration agreement were unenforceable, and it declined to sever those unenforceable provisions because "unconscionability permeates the agreement . . . and thoroughly taints its central purpose of requiring the arbitration of employment disputes."  341 F.3d 256, 271 (3d Cir. 2003).[23]

Here, Coverall has placed into its arbitration provision so many unenforceable clauses that the provision is "permeated" by unenforceability such that the entire arbitration provision must be stricken.  To do otherwise would be to provide Coverall with "an incentive to include unlawful provisions" in its arbitration provision, Perez, 253 F.3d at 1287, and to reward it for doing just that. Accordingly, the Court should hold that the arbitration provision in Coverall's franchise agreement be stricken in its entirety.[24]

---

[23]     Although the court in Kristian did sever the unenforceable provisions of the arbitration agreement, its rationale for doing so is distinguishable from this case.  There, it did not appear that the plaintiffs were contesting severability.  Indeed, the defendant in that case argued that the class arbitration waiver was not severable, *i.e.*, if the case were to proceed on a classwide basis, the company preferred to do so in court.  The Kristian court refused to permit the company—the author of the arbitration agreement—to engage in such selective enforcement of its own agreement.  As it was the company that chose to impose an arbitration agreement, the company had to bear the risk that the arbitration may not proceed precisely as it had envisioned.  See 446 F.3d at 61-63.

[24]     Alternatively, if the Court nevertheless deems that the unenforceable portions of the arbitration provision are severable, Plaintiffs ask that the Court also strike the clause providing that the arbitrator "shall not alter or otherwise reform the terms of this Agreement."  Exs A, B, Section 21.A(6).

III.   **THIS CASE IS PROPERLY PLEADED AS A NATIONWIDE CLASS ACTION CHALLENGING COVERALL'S COMPANYWIDE POLICIES AND PRACTICES, AND, ACCORDINGLY, THE CLAIMS OF THE PLAINTIFFS FROM OTHER STATES ARE PROPERLY BROUGHT IN THIS COURT.**

As discussed in Section II.C, <u>supra</u>, Coverall's class action prohibition in its franchise agreement is unenforceable because it prevents cleaning workers from being able to vindicate their rights fully.  This case was alleged as a nationwide class action challenging companywide practices, and the Court should permit it to proceed as such (i.e. allow the parties to begin discovery, and allow the plaintiffs to set forth in a motion for class certification why these claims are certifiable as a class action).

As another means of attempting to compartmentalize the plaintiffs' claims and prevent them from proceeding on a classwide basis as they have chosen to show this Court that they can do, Coverall has requested that the claims of the named plaintiffs (and putative class members) who performed work for Coverall outside Massachusetts should be transferred to those states.  However, in making this argument, Coverall fails to recognize the propriety of nationwide class actions to challenge companywide practices and policies.  Coverall's argument is also woefully premature, as Plaintiffs have not yet moved for class certification.  See <u>Allen v. Wright</u>, 468 U.S. 737, 784 (1984) ("[A]t this stage of the litigation [a pre-certification motion to dismiss] we must put to one side all questions about the appropriateness of a nationwide class action.").

In arguing that the claims of Plaintiffs Prem and Brandao must be transferred to New Jersey and Florida, respectively (and that Pineda should not

have filed claims in Massachusetts relating to work done in New Jersey),

Coverall is in essence asking the Court to rule that national class actions are per

se improper.

In fact, as this Court has recognized, it is well settled that some cases may

be properly pursued as nationwide class actions.  In Califano v. Yamasaki, the

Supreme Court affirmed the certification of a national class in a case relating to

the administration of social security benefits.  442 U.S. 682 (1979).  There, the

Court observed that "[n]othing in Rule 23 . . . limits the geographical scope of a

class action that is brought in conformity with that Rule."  Id. at 702.  Accordingly,

the Court held:

> If a class action is otherwise proper, and if jurisdiction lies over the
> claims of the members of the class, the fact that the class is
> nationwide in scope does not necessarily mean that the relief
> afforded the plaintiffs will be more burdensome than necessary to
> redress the complaining parties.

Id.  This Court has certified multi-state class actions in In re Relafen Antitrust

Litig., 221 F.R.D. 260 (D. Mass. 2004), and Mowbray v. Waste Management

Holdings, Inc., 189 F.R.D. 194, 202 (D. Mass. 1999).

Coverall's effort to thwart nationwide class treatment (before Plaintiffs

have even sought certification) is yet another attempt to deny its cleaning

workers the opportunity to vindicate their rights, in violation of Kristian.  In this

case, the forum selection clause that Coverall seeks to enforce with respect to

Plaintiffs Brandao, Prem, and Pineda would operate to deny these cleaning

workers' ability to vindicate their rights fully by participating in this national class

action.  By extension, Coverall presumably also seeks to foreclose putative class

members from participating in this case.  The Ninth Circuit has stricken a forum

selection clause in another franchise case because the clause had "no

justification other than as a means of maximizing an advantage over

[franchisees]."  Nagrampa, 469 F.3d 1289-90.  The court noted that "[a]rguably,

[the defendant] understood those terms would effectively preclude its franchisees

from ever raising claims against it . . ."  Id.

    As applied in this case, the forum selection clause in Coverall's franchise

agreement has precisely the same effect—it will "effectively preclude" most of its

cleaning workers (who are members of the putative class here) from recovering

against Coverall for the violations alleged in the complaint.  By requiring its

cleaning workers to file claims against it separately in each state in which

Coverall operates, Coverall is simply attempting to limit the scope of its potential

liability.  Even if, as Plaintiffs allege, Coverall has operated a nationwide policy of

denying the cleaning workers the business that it has promised to them, as well

as the benefits of employment by misclassifying them as independent

contractors, it may drastically limit the scope of its potential liability by forcing its

workers to proceed against it state-by-state, knowing that it would then be held

liable in at most a handful of states where plaintiffs have managed to overcome

the hurdles to file claims regarding these same practices.

    Indeed, enforcing Coverall's forum selection clause may be at best a

hollow gesture, or a procedural formality, since the alternative may well lead to

the same result as that contemplated by Plaintiffs' multi-state complaint.  If these

claims were to be filed in federal courts in separate states, then they could all be

consolidated in Multi-District Litigation (MDL), pursuant to 28 U.S.C. § 1407.[25]

The existence of MDL proceedings demonstrates a recognition that federal

courts may apply the laws of different states in actions alleging widespread

unlawful practices by a defendant.[26]

If the Court were to require the plaintiffs to file this action separately in

each state in which they allege that Coverall has engaged in the wrongful

practices challenged here, such a result would not only allow Coverall to escape

the majority of its potential liability (even if warranted), but it would also place an

---

[25]     As noted earlier, Coverall has been subject to the same claims raised in this case time and again, see Exhibit C, which provides some further indication of the widespread nature of Coverall's practices challenged here.  In addition, although the complaint currently includes plaintiffs from only three states, Plaintiffs' counsel have been contacted by Coverall franchisees in other states as well, and Plaintiffs intend to move to amend the complaint to add additional lead plaintiffs from other states.  (The Court's ruling on the maintainability of a multi-state class action in this case will inform Plaintiffs to whether it will be necessary to have a lead plaintiff from each state in order for the rights of Coverall's cleaning workers in that state to be pressed in this action.)

[26]     The undersigned counsel are currently involved in an MDL proceeding that raises similar claims to those raised in this case.  In that proceeding, In re FedEx Ground Package System, Inc. Employment Practices Litigation, MDL No. 1700 (N.D. Ind.), FedEx Ground drivers from around the country have challenged their classification as independent contractors and have asserted claims related to misrepresentation by FedEx Ground.  In that case, the federal district court in the Northern District of Indiana, Judge Robert Miller, will be required to apply the laws of more than 30 states.

        The FedEx case originated based upon the filing of numerous separate actions in a variety of federal districts, which were then consolidated by the MDL panel.  By allowing this case to proceed as it was filed in one district, this Court could make this litigation much more efficient than this similar litigation is proceeding in the FedEx case.  For example, in the FedEx case, the plaintiffs have recently completed briefing of approximately 30 separate class certification motions.  Plaintiffs envision that if they are allowed to proceed in this case with multiple state claims in the same case, such briefing could be made more streamlined and less duplicative.  For instance, rather than separate motions, Plaintiffs could file a single motion for class certification, with briefing addressing the similarities among the various state laws demonstrating certifiability of the claims and addressing how differences among state laws may be handled through subclasses.

        In Delaventura v. Columbia Acorn Trust, 417 F.Supp.2d 147 (D. Mass. 2006), this Court noted a major deficiency of MDL litigation: that MDL transferee courts do not have the authority to try the cases transferred to them.  By allowing plaintiffs to utilize the method proposed here as an alternative to MDL litigation, this deficiency may be avoided, since this Court could try the entire action, if it is allowed to proceed as one case.  Also, in that decision, the Court noted the defense-oriented advantages of MDL litigation.  The alternative proposed here by the plaintiffs could help counteract that advantage–by permitting plaintiffs to coordinate complex litigation and try their

unnecessary burden on the federal judiciary, as well as the parties and their counsel.  By allowing Plaintiffs to proceed with this multi-state case as filed, the Court would save the resources of federal courts in other districts which would otherwise need to begin to process these separate lawsuits (assign them to judges, establish scheduling conferences, address preliminary motions, etc.) and would make unnecessary any action by the Panel on Multi-District Litigation, as well as the administrative burden of a subsequent transfer of such actions to an MDL court.

In addition, if the Court were to require that Plaintiffs file separately in each state, even though they allege that Coverall has engaged in unlawful nationwide practices, Coverall would also be able to avoid liability for a large portion of its practices given that there may not be a lead plaintiff ready to come forward in each state in which Coverall operates.[27]  As this Court has recognized in In re Relafen Antitrust Litig., lead plaintiffs may represent class members for claims arising under the laws of other states, so long as those laws are sufficiently similar for the case to be managed as a class action or so long as identifiable subclasses may be created in order to account for any material differences between the laws of the states.  In this case, Plaintiffs should be permitted to make such a showing, rather than deferring to Coverall's forum selection clause,

claims of widespread legal violations by defendants in the court that handled the pretrial litigation and is thus is more familiar with the background of the action before trial.

[27]     As discussed earlier with respect to Plaintiffs' challenge of Coverall's class action waiver, which would allow Coverall to resolve issues raised by individuals with the temerity and resources to pursue their claims while ignoring its liability to the majority of its clearning workers, enforcement of Coverall's forum selection clause would allow Coverall to defend itself in those states in which challenges are brought, while continuing its unlawful practices in the other states in which it operates.

which operates simply to limit the ability of its cleaning workers to pursue a multi-state class action.

Given that one federal court may decide the law of multiple states, there is no reason that this case cannot proceed in the district in which it was filed. Significantly, Coverall will suffer no prejudice from litigating this case in Massachusetts. Coverall is an international company that does business in Massachusetts, as well as approximately thirty other states. See Coverall Support Center Locations, http://www.coverall.com/nationalLocations.aspx. Given that Coverall does business in Massachusetts, and has counsel here, there is no disadvantage to Coverall having to defend itself in this forum.[28]

Indeed, Coverall's forum selection clause *appears* to have been designed in order to benefit the franchisees, by providing that their claims would be handled in the state in which they have worked; it does not appear to have been designed to benefit Coverall, which operates in all of these states. Thus, it would not prejudice Coverall to allow its cleaning workers to seek, through this case, to waive this benefit of local claims handling. In waiving this benefit—and allowing Plaintiffs to attempt to pursue this case on a multi-state class basis—Coverall's cleaning workers would receive the advantage that far more of them would have their rights vindicated than if the forum selection clause were strictly enforced. Moreover, declining to enforce the forum selection clause here is particularly

---

[28]    In addition, the parties may cooperate to conduct discovery in locations based upon the convenience of the witnesses. Just because this case is pending in Massachusetts, there is no reason depositions cannot be conducted in other locations as needed.
        With respect to convenience of the parties, Plaintiffs also note that Plaintiff Aldivar Brandao, who worked for Coverall in Florida, is now a resident of Massachusetts, and thus has an additional interest in having this case litigated here.

appropriate in light of the allegations in the complaint relating to the problematic circumstances surrounding Coverall's tactics in inducing cleaning workers to enter into franchise agreements.  See Doe v. Seacamp Assoc., 276 F. Supp. 2d 222 (D. Mass. 2003) (Factors considered in weighing enforceability of forum selection clauses include "the relative bargaining power of the parties and the circumstances of their negotiations" and "the presence of fraud or other undue influence.").

Because enforcement of Coverall's forum selection clause would be detrimental to its cleaning workers in preventing them from benefiting from the efficiencies of a multi-state class action, and thus further impeding the vindication of their rights in violation of Kristian, it should not be enforced.  Accordingly, the Court should deny Coverall's motions to transfer the claims of Plaintiffs Brandao and Prem and allow these claims to proceed in this case.

## IV.    PLAINTIFFS' CLAIMS HAVE BEEN BROUGHT WITHIN THE APPLICABLE STATUTES OF LIMITATIONS FOR THEIR CLAIMS, AND COVERALL'S SHORTER LIMITATIONS PERIOD MUST BE STRICKEN.

Coverall argues that the claims of Plaintiffs Prem and Correia should be dismissed under the two-year limitations period in Coverall's franchise agreement.  However, as discussed in Section II.F, supra, this provision of Coverall's franchise agreement must be stricken because it prevents plaintiffs from fully vindicating their rights, in violation of Kristian.[29]  Accordingly, the claims

---

[29]    In addition to denying the opportunity to vindicate rights, moreover, the two-year limitations period effectively serves as an impermissible waiver of workers' statutory rights for the period not covered by the two-year limitations period in the franchise agreement.  For example, the Massachusetts Legislature has explicitly provided that an employee cannot contract to waive his rights under the wage laws (which provide for a three-year statute of limitations, Mass. Gen. L. c. 149 § 150).  Specifically, "[n]o person shall by a special contract with an employee or by any other means exempt himself from" the requirements of Chapter 149, which governs payment of

of Plaintiffs Prem and Correia must be governed by the applicable statutory

limitations period, under which all of these plaintiffs' claims are timely.

Specifically, the following longer statutes of limitation are applicable to their

claims.  Mass. Gen. L. c. 149 § 150 (three-year limitation period for claims under

wage laws); Mass. Gen. L. c. 260 § 2 (six-year statute of limitations for breach of

contract claims); Mass. Gen. L. c. 260 § 5A (four-year limitation period for claims

brought under Chapter 93A); N.J. Stat. Ann. 2A:14-1 (six-year statute of limitations

for claims under New Jersey Consumer Fraud Act); N.J. Stat. Ann. 2A:14-1 (six-

year statute of limitations for contract claims).

In arguing that Plaintiff Prem's claims are untimely, Coverall makes

numerous assumptions about Plaintiffs' legal theories and then asserts that

Prem's claims all accrued more than a decade ago, when he entered into the

franchise agreement with Coverall.  Def.'s Prem Br. at 11-14.  Coverall is

incorrectly attempting to impose its view of the case on Plaintiffs.  In fact,

Plaintiffs' claims relate not only to the circumstances of contract formation but

also to, *inter alia*, Coverall's ongoing practices of refusing to provide its cleaning

workers with sufficient business to meet its monthly guarantee, removing

cleaning accounts without justification, and failing to provide replacement

accounts.

---

wages generally.  Mass. Gen. L. c. 149 § 148.  This "provision is unconditional; it sets forth no
circumstance in which such a waiver would be lawful."  Dobin v. CIOview Corp., 16 Mass. L. Rptr.
785, 2003 WL 22454602, at *5 (Mass. Super. Oct. 29, 2003).  Similarly, with respect to Chapter
93A, which has a four-year statute of limitations, the Massachusetts SJC has stated that "we
ordinarily would not effectuate a consumer's waiver of rights under c. 93A."  Canal Elec. Co. v.
Westinghouse Elec. Corp., 406 Mass. 369, 378-79 (1990).

Moreover, in arguing untimeliness, Coverall has wholly ignored that many of Plaintiffs' claims may be pursued under an "ongoing injury" theory or under the "discovery rule," both of which may extend or toll statutory limitations periods in certain circumstances.  Kristian, 446 F.3d at 44 ("Ongoing injury has traditionally been understood to toll a statute of limitations under certain circumstances."); Riemer v. St. Clare's Riverside Med. Ctr., 300 N.J. Super. 101 ("The discovery rule postpones the commencement of a cause of action until a Plaintiff knows, or should have known, of facts which establish that an injury has occurred, and that fault for that injury can be attributed to another.").  There can be no question that now is not the time for a determination of whether the statutes of limitations for certain claims is appropriately tolled under either of these theories—discovery is needed.

Once again, Coverall seeks to limit its liability and to cut off cleaning workers' rights by imposing a shorter limitations period than that in the relevant statutes.  Coverall may not be permitted to use its superior bargaining power by including such provisions in its standard-form adhesion contract.  Accordingly, the two-year limitation period in Coverall's franchise agreement must be stricken even as to those cleaning workers whose franchise agreements do not contain an arbitration provision.

**V.    PLAINTIFFS HAVE PLEADED THEIR CLAIMS WITH SUFFICIENT PARTICULARITY TO SATISFY THE FEDERAL RULES' LIBERAL PLEADING REQUIREMENTS, AND THE COMPLAINT ADEQUATELY STATES A CLAIM AS TO ALL COUNTS.**

**A.    Coverall's arguments as to the sufficiency of Plaintiffs' claims are inappropriate and premature.**

In its motions, Coverall argues that Plaintiffs' claims are not pleaded with sufficient specificity and should therefore be dismissed.  Rather than truly challenging the sufficiency of Plaintiffs' claims under Rule 12(b)(6), Coverall's arguments regarding sufficiency of the Plaintiffs' claims are actually an inappropriate attempt to overly complicate and compartmentalize the claims of each named plaintiff in order to undermine class certification.  Furthermore, these arguments, which are fact-laden, are premature, as Plaintiffs have not had the opportunity to conduct discovery at this stage in the proceedings.  Most importantly, as set forth below, Coverall's arguments regarding the sufficiency of Plaintiffs' claims are all without merit, as Plaintiffs have sufficiently pleaded their claims in the Second Amended Complaint.[30]

**B.    Plaintiffs have sufficiently pleaded a rescission claim under New Jersey and Florida law.**

Coverall's argument that Plaintiffs Aldivar Brandao and Jai Prem have failed to state a cause of action for rescission relies on a misreading of the standards for rescission claims under New Jersey and Florida law.  First, Coverall's argument that Plaintiffs must offer to return the consideration received under their contracts with Coverall in order to seek the remedy for rescission is

---

[30]    To the extent that this Court finds merit in any of Coverall's arguments here to the contrary, at most, Plaintiffs should be given the opportunity to amend their complaint to address any deficiencies.

contradicted by the Restatement section relied upon in the case Coverall cites in support of this argument.  The case of <u>Marcangelo v. Boardwalk Regency Corp</u>., 847 F.Supp. 1222, 1230-31 (D.N.J. 1994), cites the Restatement (2d) of Contracts § 384 for the requirement that the party seeking restitution must return the benefit, and this section makes clear that "a party will not be granted restitution unless (a) he returns *or offers to return, conditional on restitution*, any interest in property that he has received in exchange in substantially as good condition as when it was received by him, *or* (b) *the court can assure such return in connection with the relief granted.*"  Restatement (Second) of Contracts § 384 (1981) (emphasis added).  Contrary to Coverall's argument, and in accord with common sense, a party is not barred from the equitable remedies of rescission or restitution merely because it is not practicable to "return" any benefit received under the contract prior to bringing a lawsuit.  Instead, a party may, as Plaintiffs have done in the instant case, plead a claim for restitution on the understanding that they seek only to recover any damages to which they are entitled over and above the small sums they have earned while performing cleaning work for Coverall, which could be returned to Coverall by this Court upon a grant of relief in Plaintiffs' favor.  <u>Id</u>.

Similarly, Coverall is mistaken in arguing, on highly technical and formal grounds, that Plaintiffs have not pled sufficient facts to state a claim for the equitable remedies of rescission, restitution, and unjust enrichment.  Plaintiffs seek avoidance of Coverall's form contract, and both New Jersey and Florida law allow a contract to be rescinded if it is contrary to public policy.  <u>See</u> <u>Driscoll v.</u>

Burlington-Bristol Bridge Co., 77 A.2d 255, 270 (N.J. Super. Ct. Ch. Div. 1950),

mod. 86 A.2d 201 (N.J. 1951) ("[n]o contract, whatever its subject matter, can be

sustained, which the law, upon reasonable grounds, forbids as inconsistent with

the public interest, or as hurtful to the public order, or as detrimental to the

common good"); Park v. Wausau Underwriters Ins. Co., 547 So.2d 213, 215 (Fla.

Dist. Ct. App. 1989) ("[t]he general rule is that a contract … which is violative of a

statute or public policy will not be enforced by the courts") (citing Wechsler v.

Novak, 26 So.2d 884 (Fla. 1946) (right to contract is limited in that agreement

must not violate the law)).  Both New Jersey and Florida also have clear public

policies in favor of protecting employees, enunciated within numerous statutes

abrogating the traditional freedom of contract between employer and employee.[31]

As Plaintiffs allege in their complaint, "[b]ecause of their misclassification by

Coverall as independent contractors, [Plaintiffs] have not received the benefits

that inure from the employment relationship under law."  2d Am. Compl. ¶ 48.

This discussion also makes evident that Plaintiffs need not fulfill the formal

requirements of "unconscionability" in order to state claims for rescission,

restitution, and unjust enrichment.  Although proving unconscionability would be

one means whereby Plaintiffs could show that justice requires that their contracts

with Coverall be voided, as set forth above, both New Jersey and Florida law

---

[31]    Employee protective statutes abrogating the common law include, but are not limited to, the following:  In New Jersey, Wage Payment Law, N.J.S.A. 34:11-4.1, et seq.; Wage and Hour Law, N.J.S.A. 34:11-57; the Prevailing Wage Act, N.J.S.A. 34:11-56.25; the Worker's Compensation Law, N.J.S.A. 34:15-1; the Unemployment Law, N.J.S.A. 43:21-1, et seq.; the Temporary Disability Benefits Law, N.J.S.A. 43:21-25; the Law Against Discrimination, N.J.S.A. 10:5-1, et seq.; the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.; New Jersey Family Leave Act, N.J.S.A. 34:11B-1, and in Florida, Fla. Const., Art. X, § 24 (2006) (setting forth a provision guaranteeing employees' rights to be paid a wage "that is sufficient to provide a

provide for the avoidance of contracts that are contrary to public policy, whether or not they are also procedurally and/or substantively unconscionable.  See Driscoll v. Burlington-Bristol Bridge, 77 A.2d at 270; Park v. Wausau Underwriters, 547 So.2d at 215.

### C.  Plaintiffs have sufficiently pleaded a misrepresentation claim under Massachusetts, New Jersey and Florida law.

Coverall argues that Plaintiffs have failed to satisfy Fed. R. Civ. P. 9(b)'s requirement that claims for fraud, including misrepresentation, must be pleaded with particularity.  However, contrary to Coverall's conclusory assertions, Plaintiffs have specified "the circumstances constituting fraud," including their overall claim that Plaintiffs "have been subjected to systemic misrepresentations" as well as allegations that Coverall employees made particular misrepresentations to individual plaintiffs on specific occasions, i.e., "the who, what, where, and when of the allegedly false or fraudulent misrepresentation." Alternative Sys. Concepts, Inc. v. Synopsis, Inc., 374 F.3d 23, 29 (1st Cir. 2004). For example, in their Complaint, at ¶¶ 25-29, Plaintiffs allege that the Coverall employees who contracted with specific named plaintiffs offered specific misrepresentations in order to induce the plaintiffs to pay exorbitant franchise fees to Coverall.  At ¶¶ 30-35 of their Complaint, Plaintiffs allege further misrepresentations that Coverall employees made to individual plaintiffs on

---

decent and healthy life for them and their families"); Fla. Stat. Ann. 448.110; Fla. Stat. Ann. 448.20; Fla. Stat. Ann. 448.24; Fla. Stat. Ann. 501.201-213.

several occasions.  By virtue of these and other allegations in their Complaint,

Plaintiffs have met the pleading requirements of Fed. Rule Civ. P. 9(b).[32]

### D.    Plaintiffs have sufficiently pleaded statutory consumer protection claims under New Jersey and Florida law.

Coverall argues that Plaintiffs have failed to plead statutory consumer

protection claims under New Jersey and Florida law, but Plaintiffs' claims under

both laws are sufficient.  First, Coverall's argument that Plaintiffs' claim fails to

meet the definition of "merchandise" under the New Jersey Consumer Fraud Act

(NJCFA) is simply mistaken.  New Jersey's Appellate Division has applied the

NJCFA to allow its protections to the purchasers of business opportunities, such

as the Plaintiffs in this case, where that business opportunity is made available to

the general public.  Kavky v. Herbalife Int'l of Am., 820 A.2d 677, 679-80 (N.J.

Super. Ct. App. Div. 2003) (rejecting J & R Ice Cream Corp. v. California

Smoothie Licensing Corp., 31 F.3d 1259, 1270-74 (3d Cir. 1994)); see also

Morgan v. Air Brook Limousine, Inc., 510 A.2d 1197 (N.J. Super. Ct. Law Div.

1986) (NJCFA claim by a driver who entered into an agreement to lease a

vehicle from the defendant and then use that vehicle to service customers);

Kugler v. Koscot Interplanetary, Inc., 293 A.2d 682 (N.J. Super. Ct. Ch. Div.

1972) (NJCFA claim by attorney general on behalf of New Jersey purchasers of

cosmetics distribution businesses).

Furthermore, Coverall's argument that Plaintiffs fail to plead fraud with

sufficient particularity in connection with their claims under NJCFA and the

---

[32]     If, however, this Court finds that Plaintiffs' claims should be stated in further detail, Plaintiffs submit that this need should be resolved, at most, by granting Plaintiffs permission to amend their Complaint.

Florida Deceptive and Unfair Trade Practices Act (FDUTPA) fails, as neither claim requires Plaintiffs to plead that they were deceived or misled.  See Strawn v. Canuso, 657 A.2d 420, 433 (N.J. 1995) (NJCFA may be violated even where the claimant has not been misled or deceived, and neither reliance nor intent to defraud need be shown to establish a claim based upon misrepresentation); Davis v. Powertel, Inc., 776 So.2d 971, 974 (Fla. Dist. Ct. App. 2000) (FDUTPA does not require plaintiffs to show reliance on a fraud or misrepresentation, "because the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances").

### E. Plaintiffs have sufficiently pleaded quantum meruit and unjust enrichment claims under New Jersey and Florida law.

Coverall argues that Plaintiffs fail to state claims for quantum meruit and unjust enrichment under New Jersey and Florida law.  However, as set forth above, since Plaintiffs have alleged that the contracts they were induced to sign are not valid,[33] they are entitled to seek these quasi-contractual remedies, and it is premature and inappropriate for Coverall to argue for dismissal of these claims at this stage of the proceedings.  If their contracts with Coverall are declared void, Plaintiffs are entitled to quasi-contractual relief (i.e., quantum meruit or unjust enrichment, whichever is most appropriate) in order to avoid Coverall's being unjustly enriched at Plaintiffs' expense.  See Weichert Co. Realtors v.

---

[33]     Coverall also contends that quasi-contractual remedies are not available where an express contract exists.  However, as described above, Plaintiffs allege that no valid contract governs their relationship with Coverall; if they succeed in having these contracts rescinded, then there is no impediment to Plaintiffs' claims for quantum meruit and/or unjust enrichment.  Plaintiffs

Ryan, 608 A.2d 280 (N.J. 1992); Commerce P'ship 8098 Limited P'ship v. Equity Contracting Co., Inc., 695 So.2d 383, 386 (Fla. Dist. Ct. 1997) (remedy of quantum meruit "was adopted to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation").  In this case, Plaintiffs have alleged that Coverall's adhesion contract must be voided as violating public policy and that Coverall was unjustly enriched at Plaintiffs' expense, and this is sufficient to state quasi-contractual claims under New Jersey and Florida law.

    **F.**    **Plaintiffs have sufficiently pleaded wage claims and independent contractor misclassification claims under New Jersey and Florida law.**

Coverall attempts to establish, in one fell swoop, that Plaintiffs fail to state claims under the Florida wage laws because, it claims, there is no cause of action under Florida law for "misclassification."  However, this argument clearly misses the mark, as the Florida laws prohibiting misclassification simply *are* the wage and other laws intended to protect employees.  Plaintiffs state claims under the Florida wage laws because they allege that they were properly considered employees under Florida law.  Second Amended Complaint, ¶¶ 41-46.  Furthermore, Coverall's specious arguments to the effect that Plaintiffs fail to state claims under the wage laws because they fail to specify each state's wage

---

have also alleged a claim for breach of contract, but it goes without saying that plaintiffs are free to allege claims in the alternative.

statute in their Complaint seems based on an improper attempt to

compartmentalize the Plaintiffs' claims.[34]

## VI.   COVERALL'S MOTION FOR SUMMARY JUDGMENT AS TO NILTON DOS SANTOS MUST BE DENIED AS PREMATURE, AS COVERALL IS IN POSSESSION OF THE INFORMATION NECESSARY FOR PLAINTIFFS TO OPPOSE THIS MOTION.

Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  As set forth in the attached Affidavit of Hillary Schwab,

Esq., Coverall filed its summary judgment motion as to Plaintiff Nilton Dos Santos

approximately one month after Dos Santos was added as a plaintiff in this matter

and before the parties have had the opportunity to do *any* discovery.  Schwab

Aff. ¶¶ 2-5.  Indeed, the parties have not yet exchanged automatic disclosures,

and a scheduling order has not yet issued in this case, so Plaintiffs are precluded

from conducting discovery at this early stage of the proceedings.  Schwab Aff. ¶

5; Local Rule 26.2(A).

In the Second Amended Complaint, Plaintiffs have alleged that Nilton Dos

Santos has suffered from the same companywide violations by Coverall as the

other named plaintiffs (and other Coverall franchisees).   Schwab Aff. ¶¶ 6-7.

Additionally, Dos Santos' attached franchise agreement establishes that he was

---

[34]      Again, to the extent that this Court agrees that Plaintiffs should list the wage statutes in question in their claim for relief under the several wage laws, again, Plaintiffs submit that this would be best resolved by permitting Plaintiffs to amend their Complaint.

subject to *identical* terms and conditions as franchisees who contracted directly with Coverall and that he was explicitly obligated to Coverall itself pursuant to the agreement.  Schwab Aff. ¶ 7, Ex. D.  This information is more than sufficient for Plaintiffs to defeat a Rule 12(b)(6) motion as to Coverall's relationship with Dos Santos.

Moreover, as detailed in the attached affidavit, Coverall is in sole possession of the additional information from which Plaintiffs may contest the statements and arguments in Coverall's summary judgment motion.  Schwab Aff. ¶ 8.  Specifically, Coverall is in possession of the information relating to its relationship with R & B and to its involvement in the administration of R & B franchises, including Dos Santos'.  This information is crucial to a determination of whether Coverall is liable for violations against Dos Santos.  See, e.g., Wayne Scott v. NG U.S. 1, Inc., 67 Mass. App. Ct. 474 (2006) (court will set aside corporate form where "there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent purpose or injurious consequences of the intercorporate relationship"); CoWorx Staffing Services, LLC , 22 Mass. L. Rptr. 166 (2007) (entity liable if it "exercised control over the day-to-day operations of the franchisee or controlled through the franchise agreement the instrumentality which caused the harm").

As this Court has noted, it is appropriate to deny a summary judgment motion pursuant to the opposing party's request under Rule 56(f) when the moving party is in "'sole possession of the relevant facts that the non-moving

party needs to oppose the summary judgment motion.'" <u>Mowbray v. Waste Management Holdings, Inc.</u>, 45 F.Supp.2d 132 (1999) (Young, J.) (quoting <u>Hebert v. Wicklund</u>, 744 F.2d 218, 222 n.4 (1st Cir. 1984)).  Under Rule 56(f), therefore, the Court should deny Coverall's summary judgment motion as to Plaintiff Dos Santos as premature, allow the parties to engage in discovery pursuant to a yet-to-be-established scheduling order, and permit summary judgment motions to be filed pursuant to that scheduling order after the completion of discovery.

## CONCLUSION

For the foregoing reasons, the Court should deny the six motions filed by Coverall, allow the parties to proceed with discovery, and allow Plaintiffs to move for class certification.


Respectfully submitted,

PIUS AWUAH, NILTON DOS SANTOS,
GERALDO CORREIA, DENISSE PINEDA, JAI
PREM, ALDIVAR BRANDAO,
and all others similarly situated,

By their attorneys,


 s/Shannon Liss-Riordan
Shannon Liss-Riordan, BBO #640716
Harold L. Lichten, BBO #549689
Hillary Schwab, BBO #666029
PYLE, ROME, LICHTEN, EHRENBERG
        & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108
(617) 367-7200

Jerald R. Cureton, admitted *pro hac vice*
Anthony L. Marchetti, admitted *pro hac vice*
CURETON CAPLAN
3000 Midlantic Drive, Suite 200
Mt. Laurel, NJ 08054
(856) 824-1001

Dated:        August 13, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2007, I caused a copy of this document to be served by electronic filing on all counsel of record.

  s/ Hillary Schwab
Hillary Schwab, Esq.