## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PIUS AWUAH, NILTON DOS SANTOS, GERALDO CORREIA, BENECIRA CAVALCANTE, DENISSE PINEDA, JAI PREM, ALDIVAR BRANDAO, PHILLIP BEITZ, RICHARD BARRIENTOS, MARIAN LEWIS, STANLEY STEWART, and all others similarly situated,

Plaintiffs,

v.

COVERALL NORTH AMERICA, INC.,

Defendant.

Case No. 1:07-cv-10287-WGY

## PLAINTIFFS' MARIAN LEWIS, STANLEY STEWART, PHILIP BEITZ, AND NILTON DOS SANTOS STATEMENT OF MATERIAL FACTS AND RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, the above-referenced Plaintiffs (the "Four Plaintiffs") present their statement of material facts.  As set forth in Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support Thereof, the disputed material facts cited herein preclude the granting of summary judgment in favor of Defendant on the Plaintiffs' various claims.[1]

1.      Defendant Coverall of North America, Inc. (referred to herein as "Coverall") does business throughout North America.  There are approximately 8,000 Coverall cleaning "franchises" in the United States, and 9,000 world-wide.  *See* Deposition of Theodore Elliot ("Elliot Dep."), attached as Exhibit 1, at 15 – 16.

---

[1]      The Massachusetts Plaintiffs have moved for summary judgment on their claim under the Massachusetts Independent Contractor Statute, M.G.L. c. 149 § 148B, because there is no factual dispute regarding the Defendant's violation of that statute. See Plaintiff's Motion for Partial Summary Judgment and Memorandum in Support Thereof, December 18, 2009 (ECF Doc. 200).

2.      Coverall requires all of its cleaning worker franchisees to enter into a Janitorial Franchise Agreement.  *Id.* at 18-19.  The standard form Coverall Janitorial Franchise Agreement is attached as Exhibit 2.

Coverall Corporate Marketing

3.      Coverall holds itself out as a commercial cleaning company that offers "a scientifically validated, comprehensive cleaning program that cleans for appearance and to reduce the spread of infection."  *See* Coverall web site, www.coverall/locations_usa.aspx, last accessed January 14, 2010, attached hereto as Exhibit 3.

4.      Coverall "obtains customer accounts, which are contracts between Coverall and cleaning customers, under which Coverall delegates the performance of services to its franchisees."   Ex. 2, at 2, Recital D.

5.      Coverall markets itself to customers as directly providing commercial cleaning services without making a distinction between itself and master franchisors.

6.      The Coverall website explicitly advertises cleaning services.  *See* Ex 3. The website states: "For the same price or less than traditional commercial cleaning services Coverall offers more with our scientifically validated, comprehensive cleaning program that cleans for appearance and to reduce the spread of infection.

7.      Coverall offers its services without distinguishing between master franchisors and Coverall-owned service centers.  It advertises having sold 9,000 franchises world-wide through 90 service centers, which includes those franchises officially sold through master franchisors.  Id.; Ex. 1, Elliot Tr. at 15-16.  The website does not indicate that only 5,000 of these "franchises" are actually Coverall of North

America, Inc. "franchises," whereas the rest are sold by the master franchisors.  Ex. 1, Elliot Tr. at 15-16.  The service centers are also confused with offices for master franchisors.  The website provides the address for the Dallas/Ft. Worth Regional Support Center, the San Francisco Regional Support Center, and the Worcester Regional Support Center, and each of those addresses are identical to the addresses for PCS, Melton, and R&B Services, respectively.  See Ex. 1. Compare PCS-Coverall Franchise Agreement, attached as Exhibit 4 at 1; August 28, 2007 letter from Arthur Gardner to Phillip Beitz, attached as Exhibit 5, sent by "Coverall of Mid-State California" from same address as San Francisco Regional Support Center on website; R&B Services Janitorial Franchise Agreement, attached as Exhibit 6.

8.     The Coverall website allows users to request a price-quote by entering their name, address, contact information and building type.  No indication is given that this information will possibly be transmitted to an intermediary master franchisee.  See http://www.coverall.com/quoterequest.aspx, last accessed January 14, 2005.

The Master Franchisors

9.     Coverall contracts with its franchisees either directly or through a so-called "master franchisor" intermediary that sells Coverall franchises in a certain geographic region.  See Elliot Dep., Ex. 1, at 111.  Coverall contracts with its master franchisors through Service Franchise Agreements, each of which is nearly identical.[2]

10.    Melton Franchise Systems, Inc., ("Melton") is a master franchisor for Coverall in California, with which Plaintiff Beitz contracted to become a Coverall franchisee.  Melton officially operates under a d/b/a designation of "Coverall of Mid-

---

[2] Where each of the Service Franchise Agreements is virtually identical, one citation will be offered for each shared provision.

State California."  A copy of the Melton Service Franchise Agreement is attached as Exhibit 7.

11.     Pacific Commercial Services LLC, ("PCS") is a master franchisor for Coverall in Texas, with which Plaintiffs Lewis and Stewart contracted to become Coverall franchisees.  PCS officially operates under a d/b/a as Coverall of Dallas.  A copy of the PCS Franchise Agreement is attached hereto as Exhibit 8 (identical to Exhibit 4).

12.     R&B Services, Inc. ("R&B Services") is a master franchisor for Coverall in Massachusetts, with which Plaintiff Dos Santos contracted to become a Coverall franchisee.  R&B Services, Inc. officially operates under a d/b/a designation Coverall of Worcester.  A copy of the R&B Services Franchise Agreement is attached hereto as Exhibit 9 (identical to Exhibit 6).

13.     Coverall reserves the right to substantially control the operations of its master franchisors.

14.     Coverall licenses its master franchisors to use its marks and trademarks, including the trade name "Coverall."  *E.g.,* Ex. 7, § 1.A.  The master franchisors are required to use the marks as specified by Coverall, and substitute different trade names, trademarks or service marks as directed by Coverall.  *Id.*, §1.B,C.

15.     The master franchisors are not allowed to use *any other* marketing or business techniques or systems other than those developed by Coverall, without prior approval of Coverall.  *Id.*, §1.D

16.     Although the master franchisors are ostensibly independent of Coverall to conduct business, such independence is illusory.  Coverall reserves the right to approve

all franchise agreements between master franchisors and the janitorial franchisees who perform the cleaning services. *Id.*, §1.E ("All such sublicenses shall be granted pursuant to a written franchise agreement between Franchisee and its Janitorial Frnachisees, which agreement shall be on terms (i) approved by Coverall as to use of the Marks, termination, renewal, notices, and quality control standards . . . .  The form of franchise agreement between a Service Franchisee and a Janitorial Franchisee containing terms currently being approved by Coverall is attached to the Service Franchise Offering Circular  . . . ."

17.     Coverall requires its master franchisors (ie. the officers, directors, shareholders, partners, or sole proprietor depending on the form of business) to execute a non-disclosure agreement that covers customer lists, billing, pricing, customer bidding, billing methods, quality assurance programs, pricing, quoting, billing methods, target markets, and many other basic items. *Id.*, § 1.H

18.     Coverall assists the master franchisor in selecting and furnishing an office, equipment, and supplying employees and initial janitorial service clients.  *Id.*, § 2.A.

19.     Coverall requires that the master franchisors operate their service franchise, and instruct their janitorial franchisees to operate their franchises, "in a manner consistent with and in compliance with procedures, methods and standards set forth in Coverall's training course, and all manuals and directives that Coverall thereafter may issue to the Franchisee from time to time pertaining to the methods and techniques of operating a COVERALL Franchise." *Id.*, § 3.A.  Coverall has meetings with its master franchisees on joint policies and standards and discuss common issues,

and to "get everybody on a common platform."  See Ex. 28, Cumbow Dep. Vol. I at 26:23-27:3.

20.     A master franchisor must, because "it is necessary to have uniformity in the [Coverall] System," prepare and submit to Coverall a janitorial franchise agreement within 90 days after executing the Service Franchise Agreement that is "consistent . . . with the janitorial franchise agreement which Coverall is then using for its own janitorial franchises."  Id., § 3.B.

21.     The master franchisors must use forms and agreements, and provide only those services, approved by Coverall.  Id., § 6.B.

22.     The master franchisors must allow Coverall access to their books and records for inspection upon reasonable notice.  Id., § 6.D.  Coverall requires that each master franchisor perform a yearly audit and provide Coverall with a copy of the audit.  Id., § 6.E.  Coverall also requires that each master franchisor install Coverall-provider computer software that "provide[s] Coverall with full access to [the Master] Franchis[or]'s accounting and financial information," and provide to Coverall "such data, reports and information as Coverall shall request, at such times Coverall shall request."  Id., § 6.F.

23.     The master franchisors must inform Coverall of all changes to its staff who are "responsible for the operation of the [Coverall] System."  Id., § 6.H(6).

24.     The master franchisors must "[t]rain or cause to be trained new personnel responsible for the operation of the [Coverall] System to the approval and satisfaction of Coverall.  Id. § 6.H(7).

25.     The master franchisors must agree, in the event of termination or expiration of the service franchise agreement, to a nationwide non-solicitation and non-competition clause that extends for five years.  *Id.*, § 7.B.

26.     The master franchisees compete with Coverall's regional offices in marketing and sales competitions.  Coverall asks both its own regional offices and master franchisees to compete to increase collections from cleaning customers in return for cash prizes paid by Coverall.  See October 2002 Regional Collection Race fliers, showing Dallas and San Francisco regional offices competing on second page, attached hereto as Exhibit 31.  The Dallas and San Francisco offices are the same offices as PCS and Melton, respectively.  See ¶ 7, supra.

27.     Under the PCS Service Franchise Agreement, when PCS is "using the Coverall name or Mark as part of a business name," it must do use under the designation "DBA" or "TA" for documents to have legally binding effect.  Ex. 8, § 1.A(2).

The Janitorial Franchise Agreements

28.     The Four Plaintiffs each entered into so-called Janitorial Franchise Agreements substantially similar and in many parts identica, to each other and to the Coverall Franchise Agreement with their respective master franchisor.  All such agreements include the identical subheading: "Janitorial Franchise Offering Circular."

29.     A copy of the Melton Franchise System Janitorial Franchise Agreement signed by Plaintitff Beitz is attached as Exhibit 10 (the "Melton-Coverall Franchise Agreement").  The Melton-Coverall Franchise Agreement signed by Plaintiff Beitz includes a footnote: "© 2005 Coverall North America, Inc."  A copy of the PCS Janitorial Franchise Agreement signed by Plaintiff Lewis is attached hereto as Exhibit 11 ("PCS-

Coverall Franchise Agreement").  The PCS-Coverall Franchise Agreement signed by Plaintiff Lewis includes a footnote: "© 2006 Coverall of Dallas."  A copy of the R&B Services, Inc. Janitorial Franchise Agreement signed by Plaintiff Dos Santos is attached hereto as Exhibit 12 ("R&B Services-Coverall Franchise Agreement").  The R&B Services-Coverall Franchise Agreement includes a footnote: "© 2001 Coverall North America, Inc."

30.    Plaintiffs Beitz, Lewis, Stewart, and Dos Santos paid large sums of money upfront to acquire their Coverall franchises and thereby earn the right to clean commercial properties under the Coverall trademark.  For example, Beitz paid an initial franchise fee of $14,750, including a $7,500 down payment.  *See* Ex. 10.  Dos Santos paid an initial franchise fee of $14,000, including a $9,500 down payment.  *See* Ex. 12. Plaintiff Lewis paid an initial franchise fee of $23,400, all of which was financed.  *See* Ex 11.

31.    Coverall required each of the Four Plaintiffs to enter into a confidentially and non-competition agreement contained within their respective franchise agreements. These included in-term and post-term covenants not to compete.  *E.g.*, Ex. 10, § 19.

32.    The in-term covenant not to compete provide that the franchisee:

Will not engage in or have any financial interest in . . . any business (other than a franchise granted by this agreement) which performs janitorial or related cleaning and management services, franchising, sales or contracting, or any related business anywhere.  In addition, Franchisee will not interfere with Coverall customer accounts, by attempting to persuade the cleaning accounts to do business with anyone other than Coverall; by way of example, influencing the customer accounts to pay Franchisee or some affiliated person or entity directly.

*Id.*, § 19.

33.    The post-termination covenant is similarly restrictive and applies regardless of why a franchisee is terminated:

8

Franchisee agrees not to compete, directly or indirectly , for a period of eighteen (18) months from the date of assignment, termination, or expiration with Coverall or any of Coverall's affiliates or franchisees by engaging in or having any financial interest in …. Any business that performs building cleaning and maintenance services in any county located in partially or entirely within, or contiguous to, the Metropolitan Statistical Areas in which Franchisee's Coverall Regional office conducts business, or within a 100-mile radius of that geographic are covered by this Paragraph 19B, interfere or attempt to interfere with preciously existing Coverall cleaning customers by diverting or attempting to divert from Coverall any cleaning accounts which were being serviced by Coverall franchisees or subcontractors during the year preceding the dated on which Franchisee left the Coverall system.

*Id.*, § 19.B

34.     Because of the in-term covenant not to compete, Coverall cleaning worker franchisees can only perform cleaning related services under the auspices of Coverall. *See* Deposition of Jacqueline Vlaming ("Vlaming Dep."), June 10, 2009, attached as Exhibit  13, at 75 – 76.

35.     The master franchisors presented themselves to the franchisees (ie. the Four Plaintiffs) and to customers of the franchisees at all times as a division of Coverall, and made no effort to distinguish themselves as a distinct corporate entity.

**Plaintiff Lewis**

36.     PCS's communications to Plaintiff Lewis all came on letterhead bearing the "Coverall Cleaning Concepts" trademark.  *See* letter from Robert Piazza to Marian Lewis, attached hereto as Exhibit 14.

37.     Coverall confused its own corporate name with PCS's trade name while doing business with Plaintiff Lewis.  Plaintiff Lewis signed a guaranty to her Coverall Janitorial Agreement that defined "*Coverall North America, Inc*. dba Coverall of Dallas," and did not once refer to PCS.  *See* Guaranty attached hereto as Exhibit 15.

38.     Plaintiff Lewis, as did Plaintiffs Dos Santos, Stewart, and Beitz, received training prepared and organized by Coverall.  *See* Lewis Training Acknowledgment attached hereto as Exhibit 16.

39.     Plaintiff Lewis signed an acknowledgment that he received a Coverall Cleaning Concepts Janitorial Franchise Owner Policies and Procedures Manual, which did not refer to PCS.  *See* Acknowledgment of Receipt, dated November 29, 2006, attached hereto as Exhibit 17.  The Acknowledgment of Receipt requests that Plaintiff Lewis sign and date the form and return a copy to the "Coverall Cleaning Concepts Regional Support Center for placement in your franchise file."

40.     PCS's required its franchisees, such as Plaintiff Lewis, to have business cards bearing its Coverall corporate support center address.  *See* Business Card Order Form, attached hereto as Exhibit 18 (also bearing "Coverall Cleaning Concepts" letterhead)

41.     Plaintiff Lewis received a letter of compliance regarding O.S.H.A. regulations stating that he received information from "Coverall" concerning the legal requirements of operating a business.  *See* Letter of Compliance attached hereto as Exhibit 19.  The compliance letter did not refer to PCS.

42.     On Febuary 13, 2007, Plaintiff Lewis accepted an account transfer from another franchisee using a form indicating that she "accepts responsibility for all services for the Customers pursuant to Coverall's contract with the Customer . . . ."  *See* Account Acceptance Form, attached hereto as Exhibit 20.  The Account Acceptance Form does not define "Coverall" as "PCS" or indicate a "dba" designation for Coverall.

43.     Plaintiff Lewis signed a Receipt of Completed Franchise Agreement acknowledging that she received a "completed Coverall North America, Inc. franchise agre[ement]."  *See* Receipt of Completed Franchise Agreement attached hereto as Exhibit 21.  Plaintiff Lewis' signed forms regarding her Election of Insurance Coverage indicated that "Coverall Cleaning Concepts makes available certain insurance programs" for the franchisees," and only referred to Coverall and its Dallas Regional Support Center and did not once refer to PCS.  *See* Election of Insurance Coverage forms attached hereto as Exhibit 22.

44.     The official Authorization Form signed by Plaintiff Lewis states he "requests and authorizes *Coverall of North America, Inc.*" to allow him to participate in the insurance plan."  Id. (final page, emphasis added).  This is notable because the same form signed by Plaintiff Stewart is identical except that instead of "Coverall of North America, Inc.," it identifies "Pacific Commercial Services, LLC."  Infra, ¶46.  Both of the Authorization Forms used for Plaintiff Lewis and Stewart were revised in 2006, thus indicating that the discrepancy is not due to a different form being used, but to the lack of any distinction in Coverall's perspective between the two corporate entities.

**Plaintiff Stewart**

45.     Plaintiff Stewart, whose franchise agreement was also with PCS, made payments to "Coverall Commercial Cleaning Concepts."  *See* copy of check number 2136573 attached hereto as Exhibit 23.

46.     Plaintiff Stewart signed a Receipt of Completed Franchise Agreement acknowledging that he received a "completed Coverall North America, Inc. franchise agre[ement]."  *See* Receipt of Completed Franchise Agreement attached hereto as

Exhibit 24.  Plaintiff Lewis' signed forms regarding her Election of Insurance Coverage that indicated that "Coverall Cleaning Concepts makes available certain insurance programs" for the franchisees," and only referred to Coverall and its Dallas Regional Support Center and did not once refer to PCS.  *See* Election of Insurance Coverage forms attached hereto as Exhibit 25.

47.     Unlike the same form signed by Plaintiff Lewis, the official Authorization Form signed by Plaintiff Stewart states that he "requests and authorizes *Pacific Commercial Services, LLC*" to allow him to participate in the insurance plan."  Id. (final page, emphasis added).  The form signed by Plaintiff Lewis referred to the parent company, Coverall of North America, Inc.  Supra, ¶43.

### Plaintiff Beitz

48.     Plaintiff Beitz, whose franchise agreement was officially with Melton, accepted customer accounts using forms identical to those used by Plaintiffs Lewis and Stewart.  The forms referred only to "Coverall" and never to Melton.  *See* Account Acceptance Form attached hereto as Exhibit 26.

49.     Plaintiff Beitz made his down payment check payable to "Coverall."  *See* copy of check number 2136 dated January 31, 2006 attached hereto as Exhibit 27.

### Plaintiff Dos Santos

50.     Plaintiff Dos Santos, whose franchise agreement was officially with R&B Services, paid his down payment by check to "Coverall" on February 21, 2002.  *See* check number 1616 attached hereto as Exhibit 28.

51.     Plaintiff Dos Santos, like Plaintiffs Lewis, Stewart, and Beitz, received training prepared and organized by Coverall.  *See* Dos Santos Training Acknowledgment attached hereto as Exhibit 29.

## II.     Response to Defendant Coverall of North America, Inc. Statement of Undisputed Material Facts

1.     Not disputed.  However, this is not a material fact.

2.     Disputed to the extent that Coverall is also in the business of providing cleaning services directly to customers through its misclassified independent contractor janitorial franchisees.

3.     Disputed to the extent that the master franchisors are independent business owners.  Coverall does not distinguish itself from the master franchisors[3] for any significant purpose, and thus the masters are in effect agents and/or alter-egos of Coverall.

4.     Disputed to the extent that the relationship between Coverall and each master franchisor is in reality an agent and/or alter-ego relationship, and thus any alternative relationship reflected in the agreements is not factually or legally accurate.

5.     Disputed to the extent that Coverall does have a relationship, legal and factual, with those who purchase franchises from master franchisors.

6.     Disputed to the extent that Coverall, by the terms of its own Service Franchise Agreements, provides uniform training material to master franchisors and require the master franchisors to strictly conform to Coverall's techniques in its training of employees and franchisees.

---

[3] Defendant's Statement of Undisputed Facts identifies master franchisors as "master franchisees." Plaintiff believes the entities are more accurately designated as franchisors and thus uses this designation.

7.      Disputed to the extent that master franchisors are required to keep business records available for inspection by Coverall and the requirement does not indicate whether such records are internal solely or whether they also include those records reflecting the business data of the janitorial franchisees.  In fact, the master franchisors "used the same software that Coverall uses to run their operations and in some cases coverall actually hosts the mater's data."  Deposition of Steven Cumbow Dep., Vol. I, ("Cumbow Dep. Vol. I") attached hereto Exhibit 30, at 27:4-7.

8.      Not disputed.

9.      Not disputed, but only to the extent that Pacific Commercial Services, LLC was in name a master franchisor.

10.     Disputed to the extent that PCS was identified as a distinct corporate entity from Coverall on the franchise offering circular.

11.     Disputed to the extent that PCS was identified as a distinct corporate entity from Coverall on the training material.  In fact, Lewis received and signed an acknowledgment of training that only identified Coverall as the training provider.  *See* SOF, ¶37.

12.     Disputed to the extent that PCS was identified as a distinct corporate entity from Coverall on the training material, and that Lewis communicated directly with Coverall on other occasions.

13.     Disputed to the extent that legally and/or factually Coverall controls PCS and thus employs Lewis.  Regardless of the contractual arrangement, Lewis is a *de facto* employee of Coverall.

14.     Not disputed.

15.     Not disputed, but only to the extent that Pacific Commercial Services, LLC was in name a master franchisor.

16.     Disputed, and this is not a material fact.

17.     Disputed to the extent that PCS was identified as a distinct corporate entity from Coverall on the franchise offering circular.

18.     Disputed to the extent that PCS was identified as a distinct corporate entity from Coverall on the training material.

19.     Disputed to the extent that PCS was identified as a distinct corporate entity from Coverall on the training material, and after the training, Stewart communicated directly with Coverall.

20.     Disputed to the extent that legally and/or factually Coverall controls PCS and thus employs Stewart.  Regardless of the contractual arrangement, Stewart is a *de facto* employee of Coverall.

21.     Not disputed.

22.     Not disputed, but only to the extent that Melton Franchise Systems, Inc. ("Melton") was in name a master franchisor.

23.     Disputed to the extent that Melton was identified as a distinct corporate entity from Coverall on the franchise offering circular.

24.     Disputed to the extent that Melton was identified as a distinct corporate entity from Coverall on training material.

25.     Disputed to the extent that Melton was identified as a distinct corporate entity from Coverall on the training material, and after the training, Beitz communicated directly with Coverall.

26.     Disputed to the extent that legally and/or factually Coverall controls Melton and thus employs Beitz.  Regardless of the contractual arrangement, Beitz is a *de facto* employee of Coverall.

27.     Not disputed.

28.     Not disputed, but only to the extent that R&B Services, Inc. ("R&B Sevices") was in name a master franchisor.

29.     Disputed to the extent that R&B Services was identified as a distinct corporate entity from Coverall on the franchise offering circular.

30.     Disputed to the extent that R&B Services was identified as a distinct corporate entity from Coverall on training material.  In fact, Dos received and signed an acknowledgment of training that identified Coverall only as the training provider.  *See* SOF, ¶48.

31.     Disputed to the extent that R&B Services was identified as a distinct corporate entity from Coverall on the training material, and after the training, Dos Santos communicated directly with Coverall.

32.     Disputed to the extent that legally and/or factually Coverall controls R&B Services and thus employs Dos Santos.  Regardless of the contractual arrangement, Dos Santos is a *de facto* employee of Coverall.

33.     Not disputed.

34.     Not disputed, but only to the extent that this is what the PCS Agreement purports to do.

35.     Agreed to the extent that this is what the PCS Agreement purports to do.

36.    Agreed to the extent that PCS was formed in name as a Texas limited liability company, but disputed in that PCS is in fact the alter-ego and/or agent of Coverall for the reasons described in the Statements of Fact.

37.    Disputed because Coverall expressly advertises its services from the Dallas/Ft. Worth Regional Service Center where PCS is officially located.  *See* SOF, ¶7. Thus, presumably, there are at least common employees at this common office.

38.    Disputed to the extent that Coverall requires the master franchises to use the same computer software to run its financial data, and sometimes hosts the financial data of the master franchisors.  *See* Ex. 28, Cumbow Dep. Vol. I at 27:4-7.

39.    Not disputed, but this is not material.

40.    Disputed to the extent that PCS by contract provides such billing and collection services and PCS is the alter-ego and/or agent of Coverall as detailed in the Statement of Facts.

41.    Not disputed, but this is not material.

42.    Disputed to the extent that the loans that Coverall has provided to PCS amounts to a clear investment in PCS's operations.  *See* Kevin Derella Affidavit ("Deella Aff."), ¶7.  Coverall acknowledges that it has provided loans to assist PCS in making its franchise fees and purchasing assets.  *Id.*  If PCS is successful, Coverall realizes a return on its loans.

43.    Not disputed, but this is not material.  This is disputed to the extent that PCS's obligations, by virtue of its agency and/or alter-ego relationship with Coverall, are in fact Coverall's obligations, and thus Coverall must guarantee such obligations.

44.     Disputed to the extent that Coverall has the at least the right to demand a security interest for the loans in question.  *See* Melton-Coverall Franchise Agreement, Ex. 7, § 4.B.

45.     Not disputed, but this is not material.

46.     Disputed to the extent that the regional service centers are at least represented by Coverall as jointly owned.

47.      Disputed to the extent that Coverall's characterization of its profiting sharing with PCS is entirely semantic.  PCS earns profits based on payments from janitorial cleaning franchises.  PCS pays Coverall a share of the revenues that these payments bring as stipulated by contract.

48.     Not disputed, but only to the extent that none of the payments from PCS to Coverall are accounted for as dividends or profits.

49.     Disputed.  Coverall authorized PCS to enter into such agreements by providing apparent authority through its conduct, actions and inaction as detailed herein and by controlling PCS's business operations as detailed herein.

50.     Disputed as in ¶ 49.

51.     Not disputed, but this is not material.

52.     Not disputed.

53.     Not disputed only to the extent that this is what the Melton Agreement purports to do.

54.     Disputed because Coverall expressly advertises its services from the San Francisco Regional Service Center where Melton is officially located.  *See* SOF, ¶7.  Thus, presumably, there are at least common employees at this common office.

55.     Disputed to the extent that Coverall requires the master franchises to use the same computer software to run its financial data, and sometimes hosts the financial data of the master franchisors.  *See* Ex. 28, Cumbow Dep. Vol. I at 27:4-7.

56.     Not disputed, but this is not material.

57.     Disputed to the extent that Melton by contract provides such billing and collection services and Melton is the alter-ego and/or agent of Coverall as detailed in the Statement of Facts.

58.     Not disputed, but this is not material.

59.     Disputed to the extent that the loans that Coverall has provided to Melton amounts to a clear investment in Melton's operations.  *See* Kevin Derella Affidavit ("Deella Aff."), ¶7.  Coverall acknowledges that it has provided loans to assist Melton in making its franchise fees and purchasing assets.  *Id.*  If Melton is successful, Coverall realizes a return on its loans.

60.     Not disputed, but this is not material.  This is disputed to the extent that Melton's obligations, by virtue of its agency and/or alter-ego relationship with Coverall, are in fact Coverall's obligations, and thus Coverall must guarantee such obligations.

61.     Disputed to the extent that Coverall has at least the right to demand a security interest for the loans in question.  *See* Melton-Coverall Franchise Agreement, Ex. 2, § 4.B.

62.     Not disputed, but this is not material.

63.     Disputed to the extent that the regional service centers are at least represented by Coverall as jointly owned.

64.     Disputed to the extent that Coverall's characterization of its profiting sharing with Melton is entirely semantic.  Melton earns profits based on payments from janitorial cleaning franchises.  Melton pays Coverall a share of the revenues that these payments bring as stipulated by contract.

65.     Not disputed, but only to the extent that none of the payment from Melton to Coverall are accounted for as dividends or profits.

66.     Disputed.  Coverall authorized Melton to enter into such agreements by providing apparent authority through its conduct, actions and inaction as detailed herein and by controlling Melton's business operations as detailed herein.

67.     Disputed as in ¶ 49.

68.     Not disputed, but this is not material.

69.     Not disputed.

70.     Not disputed, but only to the extent that this is what the R&B Services Agreement purports to do.

71.     Disputed because Coverall expressly advertises its services from the Worcester Regional Service Center where R&B Services is officially located.  *See* SOF, ¶7.  Thus, presumably, there are at least common employees at this common office.

72.     Disputed to the extent that Coverall requires the master franchises to use the same computer software to run its financial data, and sometimes hosts the financial data of the master franchisors.  *See* Ex. 28, Cumbow Dep., Vol. I at 27:4-7.

73.     Not disputed, but this is not material.

74.     Disputed to the extent that R&B Services by contract provides such billing and collection services and R&B Services is the alter-ego and/or agent of Coverall as detailed in the Statement of Facts.

75.     Not disputed, but this is not material.

76.     Disputed to the extent that the loans that Coverall has provided to R&B Services amounts to a clear investment in R&B Services operations.  *See* Kevin Derella Affidavit ("Deella Aff."), ¶7.  Coverall acknowledges that it has provided loans to assist R&B Services in making its franchise fees and purchasing assets.  *Id.*  If R&B Services is successful, Coverall realizes a return on its loans.

77.     Not disputed, but this is not material.  This is disputed to the extent that R&B Services' obligations, by virtue of its agency and/or alter-ego relationship with Coverall, are in fact Coverall's obligations, and thus Coverall must guarantee such obligations.

78.     Disputed to the extent that Coverall, in addition, has at least the right to demand a security interest for the loans in question.  *See* R&B Services-Coverall Franchise Agreement, Ex. 9, § 4.B.

79.     Not disputed, but this is not material.

80.     Disputed to the extent that the regional service centers are at least represented by Coverall as jointly owned.

81.     Disputed to the extent that Coverall's characterization of its profiting sharing with R&B Services is entirely semantic.  R&B Services earns profits based on payments from janitorial cleaning franchises.  R&B Services pays Coverall a share of the revenues that these payments bring as stipulated by contract.

82.     Not disputed, but only to the extent that the payments are not accounted for as profits or dividends.

83.     Disputed.  Coverall authorized R&B Services to enter into such agreements by providing apparent authority through its conduct, actions and inaction as detailed herein and by controlling R&B Services' business operations as detailed herein.

84.     Disputed as in ¶ 83.

85.     Not disputed, but this is not material.

Respectfully Submitted,

PIUS AWUAH, NILTON DOS SANTOS, GERALDO CORREIA, BENECIRA CAVALCANTE, DENISSE PINEDA, JAI PREM, ALDIVAR BRANDAO, PHILLIP BEITZ, RICHARD BARRIENTOS, MARIAN LEWIS, and STANLEY STEWART

By their attorneys,

 /s/  Shannon Liss-Riordan
Shannon Liss-Riordan, BBO #640716
Harold L. Lichten, BBO #549689
Hillary Schwab, BBO #666029
Joseph L. Sulman, BBO #663635
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
(617) 994-5800

Dated:  January 19, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2010, I served a copy of this motion by electronic filing on all counsel of record in this case.

 /s/  Shannon Liss-Riordan

Shannon Liss-Riordan, Esq.