# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____ )
PIUS AWUAH, et al., and all others          )
similarly situated,                               )          Civil Action No.
                                                           )          07-10287-WGY
                              Plaintiffs,          )
                                                           )
                    v.                                  )
                                                           )
COVERALL NORTH AMERICA, INC.,     )
                                                           )
                              Defendant          )
_____ )

## PLAINTIFFS' REPLY IN SUPPORT OF
## EMERGENCY MOTION FOR PROTECTIVE ORDER

As explained in Plaintiffs' emergency motion, Coverall is calling its current and

former cleaning workers to its office, pressuring them to take $2,000 in exchange for a

release, and contrary to its protestations to this Court, giving them misleading information

about their rights.

Further, Plaintiffs have additional evidence today that Coverall is contacting

workers who signed franchise agreements prior to 2004, when Coverall implemented its

arbitration agreement.  Attached here as Exhibit A is an affidavit from one such worker,

who signed his franchise agreement in 2002 and was called into the Coverall office this

past weekend to sign a release.  This worker, Michael Simpson, was told by Coverall that

he would have to go to arbitration in order to pursue a claim against Coverall.[1]

---

[1]        In its opposition to Plaintiffs' emergency motion, Coverall states that it contacted Jaildo Santos
(who does not have an arbitration agreement) "inadvertently" and that it has taken great pains to ensure
that it does not contact class members.  Clearly, in its rush to get as many workers as it can to sign
releases for $2,000, Coverall has not finalized an accurate list of who are class members and who are
not.  This fact alone merits the Court entering an immediate stay while this issue gets sorted out.  Coverall
has no basis for claiming it would suffer prejudice with a stay, since the only "harm" it would suffer would
that a stay would allow Plaintiffs more time to get the word out to Coverall's workers about their rights.  By

Even with respect to its workers who do have arbitration agreements, Coverall clearly does not want these workers to learn of their rights, and has gone so far as to escort the workers to and from their cars outside its office so as to prevent them from obtaining written materials from Plaintiffs' counsel and immigrant advocacy organizations supporting Plaintiffs in this lawsuit.  <u>See</u> Exhibit B (Affidavit of Harold L. Lichten).  In fact, on Saturday, a couple who say they paid $50,000 for a Coverall franchise (who thus may be entitled to receive more than $150,000 – including treble damages for their franchise fees, plus additional damages for insurance payments withheld), signed a release in exchange for $2,000, having heard only Coverall's sales pitch to them for why they should sign the release.  <u>See id.</u>

Another worker, who paid $8,000 for his franchise, was told by Coverall that he would not receive any more than $2,000 from a lawsuit, and that if he did recover any money, "most of it would be taken by the lawyers."  <u>See</u> Exhibit C (Affidavit of Eric Morales).

Another worker, who paid $12,000 for his franchise, was called by Coverall every night last week at 8:30 p.m., urging him to come in to the Coverall office to receive a refund for $2,000.  <u>See</u> Exhibit D (Affidavit of John Bridges).  On Saturday, he met with a regional vice president who told him that there was a court case involving Coverall

---

leaving multiple messages for its workers to come into its office, staying open through weekend hours, and other misrepresentations described here and in Plaintiffs' emergency motion, Coverall is clearly trying to "beat" Plaintiffs in reaching its workers; as noted in Plaintiffs' motion, Coverall has a distinct advantage in this race in that it has unfettered ability to call these workers, while Plaintiffs' counsel is limited to initiating contact with workers through written communications, and many workers do not pay attention to written communications.

Coverall would be hard-pressed to explain what the hurry is as to why it should be permitted to continue talking to its workers so quickly.  What Plaintiffs are most urgently seeking is that, if Coverall workers with arbitration agreements must ultimately pursue individual arbitrations in order to receive compensation for the fees and deductions that the Supreme Judicial Court has declared illegal, then at the very least, there should be an orderly process whereby workers learn of their rights and have the opportunity to make a reasoned, well-informed decision of what they want to do.

franchisees but that "Coverall did not consider itself to be an employer."  The regional vice president told him that, because he had incorporated his franchise, he was a corporation and not an employee.  Based on this information, he signed the release.  Today, he contacted Plaintiffs' counsel and learned that he did have a claim against Coverall.[2]  He states that if he had understood his rights, he would not have signed the release, and that he wants to pursue a claim against Coverall for the remaining money it owes him.

Though Coverall professes to rely on the legal sanctity of its arbitration clause, the circumstances of this case, in particular the developments that have occurred over the last week, make clear that Coverall is using its arbitration clause as a shield to ensure that as many of its cleaning workers as it can reach before Plaintiffs' counsel do (and Plaintiffs' counsel are vastly more limited in their ability to reach the workers than Coverall is) sign away their rights before learning of them from advocates or counsel who are watching out for their interests.  Coverall claims to be providing information to the workers about their rights, by giving them a copy of the court decisions, and telling them factually that one franchisee received less than $1,000 and another franchisee received $5,000; however, relying on Coverall to inform its workers of their rights is tantamount to asking the fox to guard the henhouse.[3]  As demonstrated through the affidavits Plaintiffs

---

[2]      In <u>Amero v. Townsend Oil Company</u>, Middlesex Superior Ct. C.A. No. 07-1080 (Mass. Super. April 15, 2009), the court rejected the defendant's argument that the fact that the plaintiff had incorporated his business meant that he could not be an employee, holding as a matter of law that the plaintiff was an employee who had been misclassified as an independent contractor and was entitled to the protections of the wage laws.  <u>See</u> Exhibit F, at 5 n.4.

[3]      Though Coverall states that it handing the workers a copy of the court decisions in this case, it is doing so while giving them misleading and inaccurate oral information.  Coverall knows that these workers are not lawyers, that many of them do not speak English as their native language, and that they are unsophisticated.  The workers who have spoken to Plaintiffs' counsel after being given the sales pitch by Coverall to sign the releases had no idea what the significance was of the court decisions that were handed to them.

submitted with their motion, and the additional affidavits Plaintiffs submit here, the
information Coverall is providing is misleading.

First of all, though it is true that the workers who had arbitrations last year (Pius
Awuah and Manuel DaSilva) were awarded less than $1,000 and approximately $5,000 is
highly misleading, given that under the SJC's more recent decision, these workers would
have received far more.[4]  Secondly, Coverall told another worker, who had paid $20,000
for his franchise plus another $8,000 in additional business fees, that he might receive
$400 or $200 if he pursued a claim against Coverall.  See Affidavit of Carlos Lopez
(Exhibit D to Plaintiffs' emergency motion).[5]  Coverall is also telling workers that, even if

---

[4]     Coverall claims in its opposition to Plaintiffs' Emergency Motion that a number of the workers
signed transfer agreements containing releases like the one Benecira Cavalcante signed.  As Plaintiffs
plan to show this Court, these releases cannot be enforced in light of the SJC decision.  In response to
Plaintiffs' argument that there was no consideration for Ms. Cavalcante's release and thus it was not
enforceable, Coverall justified the enforceability of the release by arguing that the consideration was that
Coverall would no longer be able to pursue payment on any remaining notes from Ms. Cavalcante.
However, given that the SJC ruled that the note payments (which were the financed payments for
franchise fees or additional business fees) are illegal, Coverall's inability to collect these payments from
one of its workers is not consideration for a release.  Moreover, as held by the court in Crocker v.
Townsend Oil Company, Essex Superior Court C.A. No. 09-2426 (Mass. Super. Aug. 5, 2010) (attached
here as Exhibit E), a release obtained from a worker who has been misclassified as an independent
contractor and who signed the release under the guise and misimpression that he was an independent
contractor, without the knowledge that he was actually an employee, cannot be used to release his wage
law claims.  See also DiFiore v. American Airlines, 454 Mass. 486 (2009) (SJC held that companies may
not rely on "special contracts" to avoid the wage laws); Awuah v. Coverall North America, 460 Mass. 484
(2011) (same).  Thus, Coverall's claim that a number of its workers signed transfer agreements containing
releases is of no moment; in any event, this is a merits issue (one which Plaintiffs intend to address
through a motion for reconsideration with respect to Ms. Cavalcante), not one relevant to the question of
the proper scope of the class.  See  Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 (6th Cir. 1997)
(fact that some members signed liability release forms did not justify denying class certification).

[5]     In its opposition to Plaintiffs' emergency motion, Coverall has ignored the SJC's holding in this very
case.  It is still claiming that it has valid "set-offs" against its workers' wages, which ignores not only the
SJC's Coverall ruling, but also ignores the SJC's holding another case from earlier this year, Camara v.
Attorney General, 458 Mass. 756 (2011) (finding that "voluntary" deductions made from workers' pay were
invalid under the wage laws and were not a valid set-off against wages).  Coverall also quotes this Court's
holding in a pre-Coverall case standing for the general proposition that Massachusetts courts are reluctant
to strike contracts on public policy grounds.  In making this argument, Coverall appears again to be ignoring
the import of the SJC's decision in this case.  Coverall appears to argue that parts of its franchise
agreement may stand, and that it has given something of value to its workers for which it may take a set-off
against what the SJC has declared to be wages.  What Coverall has given its workers – cleaning jobs,
training, and some starter equipment – is what employers give their employees.  These are not items of
value that, under the SJC's holding in this case, Coverall may charge its workers for.  The SJC could not

they won a case against Coverall, "the lawyers would take most of the money", a flat

untruth that this Court should not countenance.  <u>See</u> Exhibit C (Affidavit of Eric Morales).

As noted by the Plaintiffs in their Emergency Motion filed on Friday, as well as their

Notice of Supplemental Authority, the Court is well positioned to prevent Coverall's further

abuses and the one-sided and highly exploitative race that is now occurring between

Coverall and Plaintiffs.  Given the contrary authority on the issue of whether class

members with arbitration clauses should be included in a class certification order, the

Court could: (a) amend the class certification order to include the workers with arbitration

agreements, and then allow those workers to make their challenge to the enforceability of

the arbitration provision[6]; (b) amend the class certification order to certify a Rule 23(b)(2)

---

have been more clear:  "Our view is that fees such as these [Coverall's franchise fees] constitute 'special contracts,' not usual between employers and employees.  In substance, they operate to require employees to buy their jobs from employers, and in that respect we think they violate public policy."  <u>Awuah v. Coverall North America</u>, 460 Mass. 484 (2011) (same).  This is not the first time that the SJC has made clear that companies cannot exempt themselves from the wage laws through the use of "special contracts."  <u>See DiFiore v. American Airlines</u>, 454 Mass. 486.

[6]     Coverall claims that the Court has already addressed Plaintiffs' challenge to the arbitration agreement.  In fact, the hearing that was begun on Plaintiffs' challenge was never concluded because the parties reached an agreement with respect to Awuah and DaSilva to arbitrate before the Court, thus cutting short the hearing and the Court's consideration of this issue.  Thus, despite the fact that the First Circuit ruled in this case that it was appropriate for the Court to decide the enforceability of the arbitration agreement, the Court never heard the rest of the evidence or reached a final decision on this issue because the hearing was ended before it was finished.  The Court's offer to arbitrate those cases without the need for the workers to pay the costs of arbitration mitigated that issue for those two workers, but the Court never addressed any of the other provisions that Plaintiffs challenged in the arbitration clauses.

Coverall also notes that there is currently not a lead plaintiff in the case who has an arbitration clause, and thus Coverall argues that Plaintiffs do not have a representative who can raise the arbitration challenge.  This argument should be rejected.  Plaintiffs had two lead plaintiffs who had arbitration clauses, Pius Awuah and Manuel DaSilva.  The only reason these plaintiffs are different from other Coverall workers with arbitration clauses is that the Court proceeded with their arbitrations on a "test case" basis, before addressing the class certification issue (and before addressing the enforceability of the class action waiver provision – which has never been ruled upon by the Court).  A defendant should not be permitted to argue that a lead plaintiff is no longer representative because the Court has adjudicated that plaintiff's claims before addressing the class issues; in any event, if it is necessary to have a representative whose claims have not been adjudicated, Plaintiffs could now substitute other lead plaintiffs who do have arbitration agreements to represent the employees who have arbitration agreements.

As Plaintiffs noted in their emergency motion, even if arbitration were ultimately compelled for workers who signed arbitration agreements, the Court could order it be done under certain ground rules, i.e. that certain provisions would not be enforced (such as the provisions providing for fee-splitting,

class simply for the purpose of emergency declaratory relief, enjoining Coverall from obtaining releases without a fair, court-supervised process to ensure that Coverall's workers are fairly advised of their rights, and not just by Coverall; or (c) grant an emergency stay precluding Coverall from obtaining more releases pending Plaintiffs' interlocutory appeal of the Court's order excluding from the class Coverall workers with arbitration agreements.

Coverall notes in its opposition that the Court has stated its belief that, in light of the decisions that have been rendered in this case, arbitration is not illusory for Coverall workers.  The Court appears to have based this decision on the assumption that the law is now so clear that Coverall workers will obtain fair recovery that they will be able to vindicate their rights through arbitration.  However, what the Court probably did not expect when making this statement is that Coverall workers would be rushed into Coverall's office and offered $2,000 in exchange for signing releases, no matter what amount they paid in franchise fees, without having been fairly advised of their rights and based on having received incomplete and misleading and inaccurate information from Coverall.[7]

_____

truncating the statute of limitations, requiring a losing claimant to pay Coverall's fees, limiting remedies, etc.)  Coverall inaccurately states that in the D'Antuono decision, Judge Kravitz did not condition his order compelling arbitration on the company's waiver of these claims; in fact, he expressly did so, and required the defendants to make a specific representation that they would not enforce these terms in arbitration. See C.A. No. 3:11-cv-00033-MRK (D. Conn.) (Doc. #50).  In addition, also in contrast to Coverall's misstatement, Judge Kravitz is in fact now considering Plaintiffs' motion for class certification, which has a hearing set for November 2, 2011, which was filed by an employee (misclassified as an independent contractor) who did not have an arbitration agreement and is requesting that he certify a class of all affected employees, and following certification, then consider whether to compel arbitration with respect to the employees who signed arbitration agreements.

[7]     Indeed, Plaintiffs contend as well that the events of the last few days provide further support for why the class action waiver in the arbitration agreement is preventing Coverall workers from vindicating their rights, in violation of *federal law* as established by Kristian v. Comcast, 446 F.3d 25, 63 (1st Cir. 2006).  Because of the lack of class certification for workers who signed arbitration agreements, many workers are being lured into releasing their claims for egregiously inadequate consideration, without the

What has happened over the last several days has shown in fact that, as things stand, many Coverall workers will not vindicate their rights, even on an individual basis. After years of litigation, these workers do not even know of their rights and are being duped by Coverall into signing these releases for far less than the fair value of their claims.  Under these circumstances, their ability to vindicate their rights is, in fact, illusory.[8]

> Respectfully submitted,
> PIUS AWUAH, et al., and all others similarly situated,
>
> By their attorneys,
>
>   /s/  Shannon Liss-Riordan
> Shannon Liss-Riordan, BBO #640716
> Hillary Schwab, BBO #666029
> LICHTEN & LISS-RIORDAN, P.C.
> 100 Cambridge Street, 20th Floor
> Boston, MA 02114
> (617) 994-5800

Dated: October 3, 2011

---

benefit of legal representation.  In addition, a large portion of these workers are immigrants, who are as a group notoriously wary of getting involved in legal proceedings, and a large number of workers currently work for Coverall and thus depend on Coverall for their livelihood.  As this Court has noted, fear of reprisal by current workers is a reason supporting certification of a class, so that workers who are reticent to bring their own claims may have their rights vindicated by others who are brave enough to go out on a limb for their co-workers.  See Overka et al. v. American Airlines, Inc., 265 F.R.D. 14, 24 (D. Mass. 2010) ("[C]lass  adjudication is superior in the employment context because fear of employer  retaliation may have a chilling effect on employees bringing claims on an  individual basis" and holding that class action "is a superior method for adjudication  of the controversy").

[8]      In its order issued on the record, the Court stated that: "Going forward, Coverall has every right to communicate with, to renegotiate, to readjust contractual relations between themselves and present and indeed prospective employees."  Exhibit A to Plaintiffs' emergency motion, at 4.  Coverall has taken this statement, along with the Court's express on-the-record prohibition against Coverall seeking releases from class members, as full license to seek releases from non-class members (i.e. Coverall workers with arbitration agreements) for $2,000 each, a sum that Coverall is well aware is less than the fair value of their claims.  There is a big difference, however between what the Court expressly permitted-- "renegotiating" current and prospective relationships going forward--and calling in hundreds of past employees to get releases signed to relieve the company of liability for what the Supreme Judicial Court has determined to be unlawful past conduct.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2011, a copy of this document was served by electronic filing on all counsel of record.

      /s/  Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.